WEIGAND CONSTRUCTION CO., INC., and Ohio Farmers Insurance Co., Appellants–Defendants/Cross–Appellees,

v.

STEPHENS FABRICATION, INC., and Ball State University Board of Trustees, Appellees–Plaintiffs/Cross–Appellants.

No. 18A02–0910–CV–953.

Court of Appeals of Indiana.

June 25, 2010.

---

Michael L. James, Brian P. Clifford, Baker & Daniels LLP, Fort Wayne, IN, Attorneys for Appellants.

Robert S. Schein, Matthew R. Strzynski, Krieg DeVault LLP, Carmel, IN, Attorneys for Appellee Stephens Fabrication, Inc.

## OPINION

BAKER, Chief Judge.

Appellants-defendants/cross-appellees Weigand Construction Co., Inc. (Weigand), and Ohio Farmers Insurance Co. (the Surety), appeal the trial court's orders denying their motion to dismiss the complaint against them that was filed by appellee-plaintiff/cross-appellant Stephens Fabrication, Inc. (Stephens), denying their summary judgment motion, and granting

Stephens's summary judgment motion. Weigand argues that this lawsuit did not survive Stephens's voluntary bankruptcy proceedings and that Stephens's claim for additional compensation was not timely made pursuant to the terms of the parties' contract. Finding that the lawsuit survived bankruptcy but that the claim was not timely made, we affirm in part, reverse in part, and remand with instructions.

### FACTS

At some point prior to early 2002, Ball State University (BSU) hired Weigand to be the General Contractor for the Music Instruction Building project (the Project). In early 2002, Weigand sought bids from potential subcontractors to perform structural steel construction. Stephens submitted a bid, and on April 19, 2002, Weigand accepted Stephens's bid. On May 1, 2002, Weigand confirmed its acceptance with a Purchase Order, which served as the contract between Weigand and Stephens.

Among other things, the Purchase Order contained a "flow down provision," which provided, in essence, that the terms and conditions of the Weigand–BSU contract also applied to Stephens. Appellants' App. p. 117. Thus, Section 4.3.2 (the Claim Provision) of the Weigand–BSU contract applied to Stephens, and provided that if a party sought additional payment in addition to what was initially agreed upon,

> [c]laims [for the additional payment] by either party must be initiated within 21 days after occurrence of the event giving rise to such Claim or within 21 days after the claimant first recognizes the condition giving rise to the Claim, whichever is later. Claims must be initiated by written notice to the Architect and the other party.

*Id.* at 232.

Weigand hired Stephens to fabricate and supply the Project's structural steel. Ad-ditionally, Stephens was to engineer the connections between the structural steel members that would form the roof trusses and to create detailed "shop drawings" to be used by Stephens's production personnel in building the trusses to the engineer's dimensions. Stephens was unable to perform the engineering and detailing itself, so it hired two sub-subcontractors— Cecil Wilson (Wilson) and Argo Engineering (Argo)—to meet its contractual obligations to Weigand.

In June 2002, BSU's architect made several changes to the design of the Project's steel trusses. The architect sent revised architectural drawings to Weigand, which sent the drawings to Stephens. Stephens received the revised drawings on June 13, 2002, and sent them to its detailing subcontractor, Wilson. Wilson met with Argo on July 11, 2002, and they discussed the fact that the architect's revisions would require substantial changes to their own calculations. Among other things, they would have to make the connection plates—the heavy steel plates bolted to the intersections of the trusses' structural members—larger. According to Stephens, Wilson and Argo did not communicate these needed revisions to Stephens at that time.

Nine months later, on April 22, 2003, a Stephens employee orally informed a Weigand employee that the design changes would cause extra work and expense for Stephens above and beyond that originally contemplated in the Purchase Order. That conversation was the first time Stephens had informed Weigand that its work would cost more than originally contemplated. Stephens did not provide a written claim for the extra work until May 28, 2003. To keep the Project on schedule, Weigand directed Stephens to comply with

its contractual obligations and deliver the structural steel trusses as scheduled. Weigand agreed to submit Stephens's claim for extra payment to BSU for resolution while work on the Project progressed, as Weigand was required to do under the terms of its contract with BSU. BSU rejected the claim, determining that it was untimely because it failed to comply with the Claim Provision.

On September 3, 2004, Stephens filed a complaint against Weigand, BSU,[1] and Ohio Farmers Insurance[2] for breach of contract, alleging that it was owed $161,124.61 plus interests, attorney fees, and costs for "extra labor and materials for additional work on the Project." *Id.* at 107. Two months later, Stephens filed a Voluntary Petition for Relief under Chapter 7 of the U.S. Bankruptcy Code. The causes of action against Weigand, its Surety, and BSU were listed as intangible assets of the bankrupt company, which stayed the litigation. On January 4, 2007, the Trustee issued a Final Report, which stated that the claims against Weigand, its Surety, and BSU had been fully administered. *Id.* at 156. The final bankruptcy decree was entered on May 18, 2007.

On June 8, 2007, Stephens filed a motion for a status conference in the instant litigation. Stephens alleged that its claims had survived the bankruptcy despite the Trustee's filings that represented that the claims had been fully administered. On January 29, 2008, Weigand filed a motion to dismiss the complaint, arguing that because the Trustee had fully administered the causes of action, Stephens no longer had any causes of action in its possession. Stephens responded, attaching an affidavit

from the Trustee, who attested that his intent had been to abandon the lawsuit back to Stephens. *Id.* at 168–72. The Trustee attached a revised Report, which indicated that the lawsuit was now "deemed abandoned" rather than fully administered. *Id.* at 171. Neither the bankruptcy court nor Stephens's creditors were given any notice of the change in the asset's classification. On April 9, 2008, the trial court denied Weigand's motion, concluding that the Trustee had "indicate[d] the Claim in question ha[d] been abandoned back to Stephens, and Stephens is now free to pursue the Claim." *Id.* at 15. Weigand now appeals that order.

On September 24, 2008, Weigand filed a motion for summary judgment, arguing that Stephens's claim for payment was untimely because it did not comply with the Claim Provision. Stephens responded and filed a cross-motion for summary judgment. Following a hearing, the trial court granted summary judgment in Stephens's favor on January 6, 2009. On July 17, 2009, the trial court held a hearing to determine the amount of Stephens's damages, ultimately awarding $268,179.85 in Stephens's favor. Weigand now appeals the order granting summary judgment in Stephens's favor and the amount of damages. Stephens cross-appeals, arguing that the trial court erred by excluding prejudgment interest during the period before and during the bankruptcy proceeding.

## DISCUSSION AND DECISION

### I. Effect of Bankruptcy Proceedings

■ Weigand first argues that this lawsuit did not survive Stephens's bankruptcy

---

1. Stephens alleged that BSU was required to pay the "retainage" it was withholding from Weigand's contract directly to Stephens for the additional work pursuant to Indiana Code section 5–16–5.5–1.

2. Evidently, Ohio Farmers Insurance was Weigand's Surety, having issued a payment bond for the Project. Stephens alleged that the Surety was required to pay Stephens for its additional costs.

proceedings and that the trial court should have granted its motion to dismiss the complaint on this basis. We apply a de novo standard of review to a trial court's decision to grant or deny a motion to dismiss for failure to state a claim. *PricewaterhouseCoopers, LLP v. Massey*, 860 N.E.2d 1252, 1256 (Ind.Ct.App.2007).

■ Stephens's commencement of bankruptcy proceedings created a separate legal estate. 11 U.S.C. § 541(a). After filing the bankruptcy petition, title to all of Stephens's property, including its causes of action, passed to the Trustee. After a bankruptcy proceeding is closed, the bankrupt party may not sue unless the Trustee abandoned the cause of action. *Dallas Cabana, Inc. v. Hyatt Corp.*, 441 F.2d 865, 867 (5th Cir.1971); *see also In re Mars Builders, Inc.*, 397 B.R. 255, 257 (Bankr. W.D.Pa.2008) (holding that "a bankruptcy trustee ... cannot abandon a legal claim merely by failing to prosecute it, whatever its reason may be for not doing so").

■ Here, Stephens's Trustee listed the litigation herein as "fully administered" rather than "abandoned" in the final report. Appellants' App. p. 156–57. "Fully administered" is not defined in the bankruptcy code, but the bankruptcy guidelines explain that the term is broad and expressly includes assets that have been abandoned. Appellee's App. p. 5. The bankruptcy code provides that after an estate is fully administered and the court has discharged the trustee, the court shall close the case. 11 U.S.C. § 350(a). Thus, the term "fully administered" refers to non-substantive administrative functions, as a bankruptcy case cannot be closed unless all assets have been fully administered.

Here, the form completed by the Trustee offers two boxes to check next to each asset—one that says "abandoned," and one that says "fully administered." Appellants' App. p. 156. Next to the line containing the instant lawsuit, the Trustee checked only the "fully administered" option, leaving the "abandoned" option blank.[3] *Id.* The better practice, it seems, would be to check both boxes when, as here, the Trustee intends to abandon an asset back to the debtor. There is no dispute herein, however, that the Trustee did, in fact, intend to abandon this lawsuit back to Stephens. The Trustee decided not to pursue this claim for several reasons, including the value of the claim, the procedural posture of the claim, and the Trustee's inability to retain counsel to prosecute the claim within the bankruptcy. *Id.* at 169. Under these circumstances, we believe that to find that Stephens no longer possessed these claims following the bankruptcy would be to elevate form over substance to a degree we cannot countenance. Thus, although we are sympathetic to Weigand's arguments, we find that the trial court properly denied its motion to dismiss.

Given this finding, we note that included in Stephens's lawsuit against Weigand was a claim under the base contract that is separate and apart from the additional costs requested in the Claim. Specifically, Stephens argued that it was owed $39,408.09 for unpaid sums under the base contract and for certain materials. Weigand does not dispute this claim, it has merely argued that the entire complaint should be dismissed based on this above argument. Inasmuch as we have found that Weigand was not entitled to a dismissal, however, we affirm the portion of

---

**3.** Indeed, the Trustee checked "fully administered" but not "abandoned" for all of Stephens's assets aside from the proceeds of an equipment auction. In a later affidavit, the Trustee attached a revised Final Report, which checked "abandoned" in addition to "fully administered" for all of these assets. Appellants' App. p. 171.

the trial court's order awarding $39,408.09 plus attorney fees, prejudgment interest, postjudgment interest, and costs of collection to Stephens.

## II. Claim Provision

Weigand next argues that Stephens is not entitled to its extra costs because its Claim was untimely pursuant to the Claim Provision. The trial court decided this issue on summary judgment, granting Stephens's motion and denying Weigand's. Summary judgment is appropriate only if the pleadings and evidence considered by the trial court show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Owens Corning Fiberglass Corp. v. Cobb,* 754 N.E.2d 905, 909 (Ind.2001); *see also* Ind. Trial Rule 56(C). On a motion for summary judgment, all doubts as to the existence of material issues of fact must be resolved against the moving party. *Owens Corning,* 754 N.E.2d at 909. Additionally, all facts and reasonable inferences from those facts are construed in favor of the nonmoving party. *Id.* If there is any doubt as to what conclusion a jury could reach, then summary judgment is improper. *Id.*

An appellate court faces the same issues that were before the trial court and follows the same process. *Id.* at 908. The party appealing from a summary judgment decision has the burden of persuading the court that the grant or denial of summary judgment was erroneous. *Id.* When a trial court grants summary judgment, we carefully scrutinize that determination to ensure that a party was not improperly prevented from having his or her day in court. *Id.*

■ Construction of the terms of a written contract is a question of law, to which we apply a de novo standard of review. *Collins v. McKinney,* 871 N.E.2d 363, 372 (Ind.Ct.App.2007). If the contract language is unambiguous and the parties' intent is discernible from the written contract, we give effect to the terms of the contract. *Fackler v. Powell,* 891 N.E.2d 1091, 1096 (Ind.Ct.App.2008), *trans. denied.* When a contract is unambiguous, the terms as expressed within the four corners of the document are conclusive, and we do not construe the contract or look to extrinsic evidence, instead merely applying the contractual provisions as written. *Id.* The terms of a contract are not ambiguous merely because the parties disagree as to the interpretation. *Id.*

### A. Claim Timeliness

■ Here, the Claim Provision of the Weigand–BSU contract, which was incorporated into the Weigand–Stephens contract, provides as follows:

[c]laims [for the additional payment] by either party must be initiated within 21 days *after occurrence of the event giving rise to such Claim or* within 21 days *after the claimant first recognizes the condition giving rise to the Claim,* whichever is later. Claims must be initiated by written notice to the Architect and the other party.

Appellants' App. p. 232 (emphases added). It is undisputed that Stephens received the revised structural steel drawings on June 13, 2002, and the revised architectural drawings on June 20, 2002. Stephens sent those revised drawings to its engineering and detailing subcontractors, Wilson and Argo. Stephens has acknowledged that these "revisions constituted a significant change in scope of work to the Project for Stephens and constituted a major change to the methodology to the steel fabrication on the Project." *Id.* at 276–77. Argo and Wilson, Stephens's subcontractors, discussed the revisions on July 11, 2002, and determined that the revisions would re-

quire significant changes to the engineering calculations.

Notwithstanding the facts that Stephens had all of the revised drawings in its possession by June 20, 2002, and that Stephens's sub-contractors knew by July 11, 2002, that the revisions constituted a significant change to Stephens's portion of the Project work, the first time that Stephens informed Weigand that it was requesting additional payment was on April 22, 2003. At that time, a Stephens employee had a discussion with a Weigand employee, orally informing the Weigand employee "of the issues surrounding the change in scope of work" caused by the design changes. *Id.* at 279. And it was not until May 28, 2003, that Stephens actually submitted written notice of its intent to make a Claim for additional payment.

Thus, Stephens waited for eleven months from the time it had received the revisions and ten months from the time its sub-contractors had realized the implications of those revisions to provide written notice of its Claim as required by the Claim Provision—far beyond the twenty-one days required by the contract.

Stephens argues that Wilson and Argo did not communicate the changes in the scope of Stephens's portion of the Project to Stephens until April 2003, so it did not realize until that time that additional work and cost would be required. Initially, we observe that it is Stephens's responsibility to require adequate communication with its sub-contractors. Stephens could have included a "flow-down provision" in its contracts with Argo and Wilson, as Weigand did in its contract with Stephens, so that Argo and Wilson would be responsible for abiding by the same terms as Stephens. In that way, Stephens could have ensured that it complied with the terms of its contract with Weigand.

Even so, however, it is undisputed that at the *very latest*, Stephens was actually aware on April 22, 2003, that it would be making a Claim for additional payment. At that time, Stephens orally notified a Weigand employee of its circumstances. Stephens waited for an additional thirty-four days, until May 28, 2003, to provide the written Claim to Weigand. As noted above, the Claim Provision required Stephens to submit written notice of a Claim to Weigand within twenty-one days "after occurrence of the event giving rise to such Claim" or within twenty-one days "after the claimant first recognizes the condition giving rise to the Claim," whichever is later. Appellants' App. p. 232. Giving Stephens every benefit of the doubt, it is undisputed that it recognized the condition giving rise to the Claim by April 22, 2003. It failed to submit written notice of that Claim within twenty-one days. Therefore, pursuant to the terms of the contract, its Claim was untimely.[4]

In addition to the twenty-one-day rule, the Claim Provision also provides that any "Claim for an increase in the Contract Sum ... be given before proceeding to execute the Work," except in the case of certain emergencies. *Id.* Here, although Stephens had not yet begun fabricating the steel or assembling the trusses when it

---

4. Stephens directs our attention to a portion of the Code of Standard Practice published by the American Institute of Steel Construction (the AISC Code), which was incorporated into the Stephens–Weigand contract. The AISC Code requires a modification of the contract price when the scope of Stephens's work was changed. Appellee's Br. p. 5. The next section of the AISC Code, however, required that Stephens make any request for contract price adjustments "in a timely manner." Reply Br. p. 6. Here, we have found that Stephens's request was untimely; therefore, the AISC Code does not require us to reach a different result.

submitted its Claim, it—via its subcontractors—had already executed the engineering portion of its work. Indeed, this work was completed and invoiced to Stephens before any Claim was made. Stephens does not dispute that its scope of work for the Project included engineering services, nor does it dispute that this work was performed before notice was given. Therefore, Stephens submitted its Claim after it had already proceeded to execute the work, so its Claim was also untimely in this regard.

### B. Waiver

█ Stephens argues that Weigand waived the Claim Provision. Specifically, Stephens directs our attention to the undisputed fact that when Stephens orally informed Weigand of its intent to submit a Claim on April 22, 2003, the Weigand employee involved in the conversation directed Stephens to deliver the materials and maintain the delivery schedule for the Project and that the issue of Stephens's additional costs would be resolved at a later time. Additionally, the Weigand employee stated that Stephens was required to comply with the Project changes and meet its obligations for the Project or face an action for breach of contract from Weigand. Stephens argues that when Weigand insisted that Stephens proceed as scheduled, notwithstanding Stephens's intent to submit a Claim for the additional costs, Weigand waived the Claim Provision requirement that Stephens submit written notice within twenty-one days.

We cannot agree. Weigand did not promise Stephens that it would receive the funds requested in its forthcoming Claim regardless of the timeliness of that Claim. Rather, it directed Stephens to comply with the remaining portions of the contract with an assurance that Weigand would submit the Claim to BSU—as required by the terms of the Weigand–BSU contract—

at a later date, when Stephens submitted the Claim. Indeed, in its letter acknowledging Stephens's first written notice of its Claim, Weigand stated that it was "supportive" of Stephens's efforts to recover its costs but warned Stephens that BSU might deny the Claim as untimely:

> ... The primary concern that I have is the fact that this request was not made at the time that your consultants knew of this change from the Contract Documents. It always puts us in a difficult position when the parties involved are not given an opportunity to respond to a significant cost increase prior to the work already being completed.... Although I hope that this does not become an issue, we must recognize that the very fact of this delay in notice is a basis for denial of the request for extra money out of hand....

Appellants' App. p. 325. It is evident from the record, therefore, that although Weigand insisted that Stephens comply with its contractual obligations, it never promised that Stephens's Claim would be approved. Furthermore, we decline to hold that a party's insistence that its counterparty comply with its contractual obligations acts as a waiver of the party's contractual rights.

In any event, the parties' contract also provides that

> [n]o action or failure to act ... shall constitute a waiver of a right or duty afforded ... under the Contract, nor shall such action or failure to act constitute approval of or acquiescence in a breach thereunder, except as may be specifically agreed in writing.

*Id.* at 250. Thus, even if the record showed undisputed facts that would support a waiver argument—which it does not—this contractual provision would prevent us from finding that Weigand waived its right to enforce the Claim Provision.

Therefore, we find that Weigand did not, in fact, waive its right to enforce its rights under the contract.

### C. Weigand Breaches

■ Finally, Stephens argues that Weigand cannot enforce the contract against Stephens because Weigand "repeatedly, materially, and substantially" breached its own contractual obligations to Stephens. Appellee's Br. p. 29. Indeed, a party may not insist upon the performance of a contract or a provision thereof where that party is personally guilty of a material or substantial breach of the contract. *Tomahawk Village Apts. v. Farren,* 571 N.E.2d 1286, 1293 (Ind.Ct.App.1991).

### 1. AISC Code

■ First, Stephens argues that Weigand failed to comply with the provisions of the AISC Code requiring that Weigand clearly and individually communicate any design revisions to Stephens. The provision of the AISC Code to which Stephens directs our attention states that "all revisions, including revisions that are communicated through the annotation of Shop and/or Erection Drawings ... shall be clearly and individually *indicated in the Contract Documents,*" which included the Architect's Drawings. Appellee's App. p. 71; Appellants' App. p. 223. There is no requirement, therefore, that Weigand clearly and individually communicate any revisions to Stephens; instead, Weigand was simply required to indicate those revisions in the Contract Documents, including the Architect Drawings. It provided Stephens with the revised Architect Drawings, and had no further contractual obligation to highlight the Project revisions. Moreover, it is evident that Stephens's subcontractors readily understood the revisions and their import, inasmuch as they altered their engineering work according-

ly. Thus, we decline to find a breach on this basis.

### 2. Communication Regarding Trusses

Next, Stephens argues that Weigand breached the contract by failing to communicate directly with Stephens "regarding the issues involving the trusses...." Appellee's Br. p. 31. Specifically, Stephens complains that the Project architect communicated directly with Argo, Stephens's sub-contractor, rather than with Stephens itself. The Project architect, however, was not an employee of Weigand. Instead, it was acting at the behest of BSU. Stephens has offered no legal authority establishing that the actions of the Project architect can lead to a breach by Weigand; thus, we decline to find a breach in this regard.

### 3. Failure to Pay Stephens for the Extra Work

Stephens next argues that Weigand breached the agreement by failing to pay Stephens the amount requested in its Claim. This, of course, is the precise dispute at issue in this appeal, and to conclude that "Weigand has waived its right to insist that Stephens comply with the contract's notice provisions because Weigand refused to pay Stephens extra money due to Stephens's failure to comply with those provisions" is to accept a circular argument and abandon logic, which we will not do. Reply Br. p. 25. Thus, we decline to find a breach in this regard.

### 4. Response to Submittal Requests

■ Finally, Stephens notes that during its work on the Project, it sent Weigand numerous submittals, change orders, and requests for information on a variety of issues. Stephens argues that although Weigand was contractually obligated to respond to such requests within two weeks of receipt, Weigand's responses were repeatedly delayed, at times significantly so. Stephens fails to explain, however, how

these delays relate in any way to the revisions, the Claim, or the central issues involved in this appeal. We decline to find that Weigand's unrelated delays in responding to Stephens's submittals act as such a material or substantial breach of the contract that it is now prohibited from enforcing the Claim Provision against Stephens.[5]

The relevant underlying facts herein are not disputed, and we have found as a matter of law that Stephens's claim failed to comply with the contract's Claim Provision. Therefore, Weigand, rather than Stephens, is entitled to summary judgment in its favor on Stephens's complaint.

### III. Cross–Appeal

■ Stephens cross-appeals, arguing that the trial court erred by excluding the periods before and during bankruptcy from the prejudgment interest calculation. We will consider this argument to the extent that it bears on the approximately $40,000 to which we have found Stephens is entitled. We review a trial court's decision to deny prejudgment interest for an abuse of discretion. *Whited v. Whited,* 859 N.E.2d 657, 664 (Ind.2007).

■ The trial court excluded the period prior to Stephens's bankruptcy, January 1, 2004, to November 1, 2004, finding that to award prejudgment interest for that period would constitute a windfall to which Stephens is not entitled. We cannot agree. Prejudgment interest is warranted in a contract case if the terms of the contract make the claim ascertainable and the amount of the claim rests upon mere computation. *Bank One, N.A. v. Surber,* 899 N.E.2d 693, 705 (Ind.Ct.App.2009), *trans. denied.* Here, it is undisputed that Weigand owes Stephens $39,408.09 under

the base contract. Ascertaining the amount of prejudgment interest owed on that amount is a simple calculation, and there is no reason to exclude the pre-bankruptcy period from the calculation.

■ The trial court also excluded the period of time during the intervening bankruptcy proceeding. It is established, however, that prejudgment interest may continue to accrue notwithstanding bankruptcy proceedings. *See In re Investment Bankers, Inc.,* 4 F.3d 1556, 1566 (10th Cir.1993) (holding that an award of prejudgment interest during bankruptcy proceeding serves to compensate a party of a defendant's use of funds that were wrongfully withheld during pendency of suit); *In re Chattanooga Wholesale Antiques, Inc.,* 930 F.2d 458, 465 (6th Cir.1991) (holding that the defendant was properly assessed prejudgment interest during the pendency of bankruptcy proceedings because the defendant had the use of money it was not entitled to). Therefore, we find that the period of time during Stephens's bankruptcy proceeding should not be excluded from the calculation of prejudgment interest.

### CONCLUSION

In sum, we have found that Stephens's claims against Weigand, Weigand's Surety, and BSU survived the bankruptcy proceedings. Given that ruling, Stephens is entitled to the unpaid sums under the base contract: $39,408.09 plus attorney fees, prejudgment interest including the periods of time before and during the bankruptcy proceeding, postjudgment interest, and costs of collection to Stephens. We have also found, however, that Stephens's Claim for additional compensation was untimely under the terms of the relevant contracts

---

5. Inasmuch as we have found that Stephens is not entitled to the extra compensation requested in its Claim, we need not consider the parties' arguments about the way in which Stephens calculated its damages.

and that Weigand is entitled to enforce the contractual provisions in this regard. Therefore, we reverse the trial court's summary judgment order.

The judgment of the trial court is affirmed in part, reversed in part, and remanded with instructions to enter summary judgment in Weigand's favor and calculate the amount of damages owed to Stephens, which is the total sum of $39,408.09 plus attorney fees, pre- and post-judgment interest, and costs of collection.

DARDEN, J., and CRONE, J., concur.