# FOR PUBLICATION



ATTORNEYS FOR APPELLANTS:

**MICHAEL L. EINTERZ**
**MICHAEL L. EINTERZ, JR.**
Einterz & Einterz
Zionsville, Indiana

ATTORNEYS FOR APPELLEE:

**DAVID K. HERZOG**
**JON LARAMORE**
**APRIL E. SELLERS**
Baker & Daniels LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| DAVE'S EXCAVATING, INC., and LIBERTY MUTUAL INSURANCE CO., | ) ) ) | |
| Appellants-Defendants, | ) ) | |
| vs. | ) ) | No. 33A04-1104-PL-199 |
| CITY OF NEW CASTLE, INDIANA, | ) ) | |
| Appellee-Plaintiff. | ) ) | |

APPEAL FROM THE HENRY CIRCUIT COURT
The Honorable Bob A. Witham, Special Judge
Cause No. 33C01-0601-PL-1

**January 11, 2012**

**OPINION - FOR PUBLICATION**

**NAJAM, Judge**

## STATEMENT OF THE CASE

Liberty Mutual Insurance Company ("Liberty Mutual") appeals two orders entered by the trial court granting summary judgment in favor of the City of New Castle ("the City") in its suit against Dave's Excavating, Inc. ("Dave's") on a construction contract and against Liberty Mutual under a performance bond. Liberty Mutual presents four issues for review, which we restate as:

1. Whether the trial court erred when it granted summary judgment in favor of the City on the issue of Dave's' liability under the construction contract.

2. Whether the trial court erred when it granted summary judgment in favor of the City on the issue of Liberty Mutual's liability under the performance bond.

3. Whether the trial court erred when it granted summary judgment in favor of the City and awarded attorney's fees.

We affirm.

## FACTS AND PROCEDURAL HISTORY

On February 9, 2004, the City accepted bids for a sanitation project in the recently annexed McGrew Sanitation Area for a sanitary sewer and watermain extension ("the Project"). The bidders were informed that the engineer's estimated cost was $1,319,279. Dave's was the lowest bidder at $983,737.61.[1] On March 5, 2004, the City and Dave's executed a construction contract for the Project ("the contract").[2] Liberty Mutual

---

[1] The parties agree that the engineer served as the City's agent for the Project. United Consulting Engineers and Architects served as the engineer on the Project but is not a party in this case.

[2] All references to the "construction contract" or "the contract" indicate the Standard General Conditions of the Construction Contract, which the parties referred to as the General Conditions. The

2

guarantied Dave's performance with its performance bond ("the performance bond" or "the bond").

After the Project was underway, Dave's requested change orders. In one instance, the City allowed Dave's to use excavated materials as backfill to reduce additional costs arising from the nature of subsurface conditions. Then, on June 17, 2004, Dave's sent a letter to the engineer "declaring 'Differing Subsurface Conditions' in accordance with Section 4.03 of the General Conditions[.]" Appellant's App. at 140. Dave's also stated that it was "stop[ping] Work until direction has been received by [sic] the Engineer." Id. Section 4.03 of the General Conditions provides:

> 4.03    Differing Subsurface or Physical Conditions
>
> A.    Notice:    If CONTRACTOR [Dave's] believes that any subsurface or physical condition at or contiguous to the Site that is uncovered or revealed either:
>
> > 1.    is of such a nature as to establish that any "technical data" on which CONTRACTOR is entitled to rely as provided in paragraph 4.02 is materially inaccurate; or
> > 2.    is of such a nature as to require a change in the Contract Documents; or
> > 3.    differs materially from that shown or indicated in the Contract Documents; or
> > 4.    is of an unusual nature, and differs materially from conditions ordinarily encountered and generally recognized as inherent in work of the character provided for in the Contract Documents;
>
> then CONTRACTOR shall, promptly after becoming aware thereof and before further disturbing the subsurface or physical condition or perform any Work in connection therewith . . . notify OWNER and ENGINEER in writing about such condition. CONTRACTOR shall not further disturb such condition or perform any Work in connection therewith . . . until receipt of written order to do so.

---

entire contract was comprised of the General Conditions as well as other documents. Other documents will be named specifically as referred to in this opinion.

> B. ENGINEER's Review: After receipt of written notice as required by paragraph 4.03.A, ENGINEER will promptly review the pertinent condition, determine the necessity of OWNER's obtaining additional exploration or tests with respect thereto, and advise OWNER in writing (with a copy to CONTRACTOR) of ENGINEER's findings and conclusions.

Appellant's App. at 490. Dave's followed its June 17 letter with another letter on June 22, requesting a contract price increase to $1,807,960.73, an eighty-four percent increase, to complete work under the construction contract due to the alleged differing subsurface conditions at part of the Project site.

The Project's engineer replied by letter dated July 6, informing Dave's that the engineer was reviewing the claim of differing subsurface or physical conditions. The letter also referred Dave's to Article 6, Paragraph 18 of the General Conditions, which provides in relevant part that

> CONTRACTOR shall carry on the Work and adhere to the progress schedule during all disputes or disagreements with OWNER. No Work shall be delayed or postponed pending resolution of any disputes or disagreements, except as permitted by paragraph 15.04 or as OWNER and CONTRACTOR may otherwise agree in writing.

Appellant's App. at 503. The engineer's letter stated further that it was "to serve as [Dave's] written notice that in accordance with the Contract Documents, Dave's is not to delay or postpone work on the Project during resolution of [the] claim. Please recommence work immediately." Id. at 347. Counsel for Dave's replied on July 7 that "it is not possible for the work to be recommenced until the differing condition issue ha[d] been resolved." Id. at 348. Dave's also stated that the engineer's failure to investigate and propose a change order "renders the City in default of the contract, and

allows Dave's Excavating, Inc. the opportunity to rescind the contract, cease work, and avoid any further liability." Id. at 348.

The engineer replied on July 9, stating in part:

Please be aware that [neither] we nor the City agree with the interpretation of your legal council [sic] that you can refuse to re-commence work on the project on Monday[,] July 12 as previously agreed. There will be no additional tests or other subsurface investigation provided by the Owner as such investigation was otherwise your responsibility if deemed necessary prior to committing to the Contract Price and Time.

. . . The City has also advised our office to inform you that they [sic] will consider you in breach of this Contract if you are not present and working on the project at 8:00 a.m. local time on July 12, 2004[,] and will be pursuing your bond as well as other available legal remedies that may be appropriate.

Id. at 146 (emphasis added). Dave's completed work on the Project in all areas except those related to the change order requests, but the City and Dave's could not reach an agreement about the change orders based on the differing subsurface conditions claim.

On July 15, the engineer sent notice to Dave's and Liberty Mutual that the City was considering declaring Dave's in default on the construction contract. That letter also requested a meeting within fifteen days in accordance with paragraph 3.1 of the performance bond. On July 19, the City's Board of Works and Safety voted to declare the Project an emergency and to solicit bids from other contractors to complete the Project.[3] The City accepted bids in late July and, on July 29, the City held a pre-quotation meeting with four potential bidders ("the completion bidders"). The materials provided to the completion bidders stated that the "existence of sand and gravel is

---

[3] The City's Board of Works and Safety declared an emergency in part because Indiana Code Section 36-4-3-13(d)(5) requires utility installation within three years of annexation. The McGrew Sanitation Area was annexed on March 12, 2002, pursuant to the supreme court's decision in Bradley v. City of New Castle, 764 N.E.2d 212 (Ind. 2002).

anticipated in the project[,]" Appellant's App. at 788, information that had not been provided in the previous bidding process. The material provided to the completion bidders also included revised estimates that considered the allegedly unexpected conditions Dave's had encountered on the Project, id. at 853-58.

On July 22, Liberty Mutual replied to the engineer's July 15 letter, requesting a meeting between August 3 and August 6, outside of the fifteen-day time limit. The following day the engineer replied, setting the meeting for August 4. At that meeting, the City informed Dave's and Liberty Mutual of its intention to declare Dave's to be in default. On August 9, following a vote by the Board of Works and Safety, the City gave Dave's written notice that it had "declared a Contractor Default and formally terminated [Dave's] right to complete the contract." Id. at 569.

Also on August 9, the City sent a copy of the termination notice to Liberty Mutual. That correspondence informed Liberty Mutual that the City had declared the Project an emergency, that the City was scheduled to receive bids from completion bidders on August 11, and that the City "demand[ed] that [Liberty Mutual] perform its obligations as required by Paragraph 4 of the [performance b]ond." Id. at 108. In a letter dated August 10, Liberty Mutual informed the City that it was investigating the City's claim on the performance bond "under a strict reservation of all rights and defenses under the bond and common law[.]" Id. at 210. Liberty Mutual also "call[ed] on [the City] to mitigate [its] damages[.]" Id. The City replied on August 11 stating, among other things, that it "has and will further demand [Liberty Mutual] to [sic] perform its Bond obligations[.]" Id. at 580. Then, on August 31, the City wrote to remind Liberty Mutual that the surety

6

was obligated to act with reasonable promptness and "demand[ed] that the Surety perform its obligations under this Bond[.]" to it. Id. at 588. The City noted that it had received no official correspondence from Liberty Mutual since August 10.

Meanwhile, on August 16, the City's Board of Works and Safety awarded the completion contract to Eagle Valley, Inc. at a contract price of $1,215,000. Eagle Valley immediately began work on the Project and completed the same on December 16, 2004, more than five months ahead of schedule and weeks in advance of the statutory deadline. Eagle Valley completed the work at a rate nearly 100 feet per day faster than Dave's had performed.

On March 25, 2005, the City gave written demand to Liberty Mutual for payment under the performance bond because the City's costs in completing the Project had exceeded the contract price with Dave's. Specifically, the City sought $427,524.54, the amount paid in excess of the unpaid balance on the contract with Dave's. On January 6, 2006, the City filed its complaint against Dave's, seeking payment on the construction contract, and against Liberty Mutual, seeking payment under the performance bond. Dave's and Liberty Mutual answered and counterclaimed, alleging in relevant part that the City had breached the construction contract. All parties moved for summary judgment as to liability. The trial court heard argument on the motions on December 7.

Following a change of judge, a new summary judgment hearing was held April 30, 2010. On June 2, the trial court issued an order denying Dave's and Liberty Mutual's motion for partial summary judgment and granting the City's cross-motion for partial summary judgment. The City subsequently moved for summary judgment on the issue of

damages, including attorney's fees, and Dave's and Liberty Mutual filed a cross-motion for summary judgment as to damages. The trial court granted the City's motion, awarding damages and attorney's fees totaling $908,541,77, and denied Dave's and Liberty Mutual's motion. Liberty Mutual now appeals.

## DISCUSSION AND DECISION

### Standard of Review

We review a summary judgment order de novo. Bules v. Marshall County, 920 N.E.2d 247, 250 (Ind. 2010). The purpose of summary judgment is to end litigation about which there can be no factual dispute and which may be determined as a matter of law. Shelter Ins. Co. v. Woolems, 759 N.E.2d 1151, 1153 (Ind. Ct. App. 2001), trans. denied. We must determine whether the evidence that the parties designated to the trial court presents a genuine issue of material fact and whether the moving party is entitled to a judgment as a matter of law. Ind. Trial Rule 56(C); Bules, 920 N.E.2d at 250. We construe all factual inferences in the nonmoving party's favor and resolve all doubts as to the existence of a material issue against the moving party. Bules, 920 N.E.2d at 250. Summary judgment is a lethal weapon and courts must be mindful of its aims and targets and beware of overkill in its use. Heeb v. Smith, 613 N.E.2d 416, 420 (Ind. Ct. App. 1993), trans. denied.

### Issue One: Construction Contract Liability

Liberty Mutual first contends that the trial court erred when it granted summary judgment in favor of the City on the issue of liability under the construction contract. In particular, Liberty Mutual contends that issues of fact preclude the entry of summary

judgment. Liberty Mutual also maintains that the City's breach of the contract bars recovery and that the City failed to comply with the terms of the contract.[4] We address each contention in turn.

We first consider Liberty Mutual's contention that genuine issues of material fact bar the entry of summary judgment for the City. On this point Liberty Mutual initially states that a "detailed discussion of the disputed material facts is included in the Appendix at pages 763-67, and, in the interest of brevity, Dave's [sic] incorporates those pages herein for the Court's reference. In a general sense, however, the scope of work for the project remains the core dispute in this matter." Appellant's Brief at 25. But Indiana Appellate Rule 46(A)(8)(a) provides that argument contained in an appellant's brief "shall contain the appellant's contentions why the trial court . . . committed reversible error[.]" Liberty Mutual may not evade this requirement by referring us to arguments found in a brief filed at some earlier point. See Oxley v. Lenn, 819 N.E.2d 851, 856 n.2 (Ind. Ct. App. 2004) (holding same with regard to appellee's brief under Appellate Rule 46(B)(2)). Liberty Mutual may not incorporate argument from another source by reference. See id. Thus, we will consider only the argument set out in Liberty Mutual's Appellant's Brief.

In its appellant's brief, Liberty Mutual contends that there is an issue of material fact regarding the scope of work for the Project as a result of differing subsurface conditions under section 4.03. In support, Liberty Mutual points to differences between the bid documents provided when Dave's bid on the Project and those provided to

---

[4] Liberty Mutual's liability under the performance bond is derivative of Dave's' liability under the construction contract. We consider Liberty Mutual's liability under the performance bond in Issue Two.

completion bidders. The City identified the subsurface sand and gravel conditions for the first time during the emergency re-bidding process. The subsurface sand and gravel conditions are the basis for Dave's request for change orders and its dispute with the City.

Dave's apparently reasons that since the completion bidders were informed that the existence of sand and gravel was anticipated, while the previous bid documents did not include that information, it follows that there is a genuine issue of material fact on whether the subsurface sand and gravel conditions were outside the scope of work for the Project that Dave's had undertaken. But Dave's' reliance on this argument is misplaced. It is immaterial whether the bid documents provided to the completion bidders differed from those provided to Dave's in the previous bidding process.[5] The question presented, and the dispositive issue, is whether Dave's breached the terms of its construction contract with the City. Thus, Liberty Mutual has not shown the existence of a genuine issue of material fact regarding the scope of the work which would bar the entry of summary judgment.

Liberty Mutual next contends that summary judgment is barred because the City breached the construction contract. Liberty Mutual's argument is founded on its interpretation of certain contract provisions. The interpretation of a contract presents a pure question of law and is reviewed de novo. Bailey v. Mann, 895 N.E.2d 1215, 1217 (Ind. 2008).

---

[5] Liberty's argument that the information provided to the completion bidders differed from what Dave's had received in the previous bidding process suggests a lack of meeting of the minds. But, as discussed below, Dave's agreed when it executed the construction contract that it was fully informed of the conditions that could affect work on the Project. Thus, we agree with the engineer that "such investigation was otherwise [Dave's'] responsibility if deemed necessary prior to committing to the Contract Price and Time." Appellant's App. at 146.

> When construing the meaning of a contract, our primary task is to determine and effectuate the intent of the parties. First, we must determine whether the language of the contract is ambiguous. The unambiguous language of a contract is conclusive upon the parties to the contract and upon the courts. If the language of the instrument is unambiguous, the parties' intent will be determined from the four corners of the contract. If, on the other hand, a contract is ambiguous, its meaning must be determined by examining extrinsic evidence and its construction is a matter for the fact finder. When interpreting a written contract, we attempt to determine the intent of the parties at the time the contract was made. We do this by examining the language used in the instrument to express their rights and duties. We read the contract as a whole and will attempt to construe the contractual language so as not to render any words, phrases, or terms ineffective or meaningless. We must accept an interpretation of the contract that harmonizes its provisions, rather than one that places the provisions in conflict.

Whitaker v. Brunner, 814 N.E.2d 288, 293-94 (Ind. Ct. App. 2004) (citations omitted), trans. denied.

Here, Liberty Mutual asserts that the City failed to comply with section 4.03, the differing subsurface provision of the construction contract. Section 4.03 has three parts: a notice provision, a review provision, and a price and time adjustment provision. The notice provision, quoted above, directs the contractor (Dave's), in the event it finds differing subsurface or physical conditions, to notify the engineer of the situation and then to perform no further work "until receipt of written order to do so." Appellant's App. at 490. The review and price and time adjustment provisions state:

> B.    ENGINEER's Review:    After receipt of written notice as required by paragraph 4.03.A, ENGINEER will promptly review the pertinent condition, determine the necessity of OWNER's obtaining additional exploration or tests with respect thereto, and advise OWNER in writing (with a copy to CONTRACTOR) of ENGINEER's findings and conclusions.
>
> C.    Possible Price and Time Adjustments

11

1.     The Contract Price or the Contract Times, or both, will be equitably adjusted to the extent that the existence of such differing subsurface or physical condition causes an increase or decrease in CONTRACTOR's cost of, or time required for, performance of the Work; subject, however, to the following:

> a.     such condition must meet any one or more of the categories described in paragraph 4.03.A; and

> b.     with respect to Work that is paid for on a Unit Price Basis, any adjustment in Contract Price will be subject to the provisions of paragraphs 9.08 and 11.03.

2.     CONTRACTOR shall not be entitled to any adjustment in the Contract Price or Contract Times if:

> a.     CONTRACTOR knew of the existence of such conditions at the time CONTRACTOR made a final commitment to OWNER in respect of Contract Price and Contract Times by the submission of a Bid or becoming bound under a negotiated contract; or

> b.     the existence of such condition could reasonably have been discovered or revealed as a result of any examination, investigation, exploration, test, or study of the Site and contiguous areas required by the Bidding Requirements or Contract Documents to be conducted by or for CONTRACTOR prior to CONTRACTOR's making such final commitment; or

> c.     CONTRACTOR failed to give the written notice within the time and as required by paragraph 4.03.A.

3.     If OWNER and CONTRACTOR are unable to agree on entitlement to or on the amount or extent, if any, of any adjustment in the Contract Price or Contract Times, or both, a Claim may be made therefor as provided in paragraph 10.05. However, OWNER, ENGINEER, and ENGINEER's Consultants shall not be liable to CONTRACTOR for any claims, costs, losses, or damages (including but not limited to all fees and charges of engineers, architects, attorneys, and other professionals and all court or arbitration or other dispute resolution costs) sustained by CONTRACTOR on or in connection with any other project or anticipated project.

Appellant's App. at 490-91 (emphases added).

Liberty Mutual contends that the City breached the construction contract when it "[i]gnored [the r]equirement to [i]nvestigate and [a]djust" the contract price or time. Appellant's Brief at 18. But Liberty Mutual ignores that Dave's had first breached the contract under section 4.03.A by refusing to resume work when directed to do so. See Rogier v. Am. Testing & Eng'g Corp., 734 N.E.2d 606, 620 (Ind. Ct. App. 2000) ("a party who has breached a contract cannot take advantage of his breach to relieve him of his contractual obligations"). In any event, as explained below, the City complied with its obligations under section 4.03.

In its July 6, 2004, letter to Dave's, the engineer acknowledged receipt of notice of a differing subsurface condition claim under section 4.03 of the contract. The engineer then continued:

> Your letter further states that Dave's is awaiting direction concerning your claim of "differing subsurface" conditions in connection with the McGrew Area Sanitation Sewer & Watermain Extension Project. Our office and City representatives are currently reviewing your claim and information recently supplied by your office. As indicated in your referenced General Conditions Section 4.03, "Contractor shall not further disturb such condition or perform any Work in connection therewith (except as aforesaid) until receipt of written order to do so." Also, we point out that Article 6 (Contractor's Responsibilities), Paragraph 18 (Continuing to Work), of the Standard General Conditions of the Construction Contract states the following:
>
>> []CONTRACTOR shall carry on the Work and adhere to the progress schedule during all disputes or disagreements with OWNER. No Work shall be delayed or postponed pending resolution of any disputes or disagreements, except as permitted by paragraph 15.04 or as OWNER and CONTRACTOR may otherwise agree in writing.[]

13

> As directed by the City of New Castle, this letter is to serve as your written notice that in accordance with the Contract Documents, Dave's is not to delay or postpone work on the Project during resolution of your claim. Please recommence work on the Project immediately.

Appellant's App. at 347 (emphasis added).

Dave's, and now Liberty Mutual, have misconstrued section 4.03 of the construction contract. That section instructed Dave's, upon giving notice of a differing subsurface condition, to stop work "until receipt of written order to" recommence. Appellant's App. at 490. That section does not make resumption of work contingent on an investigation or on any adjustment of the contract price or time. It is undisputed that, in the July 6 letter from the engineer, the City directed Dave's to resume work on the Project immediately. Dave's' sole remedy for resolving its claim for an adjustment to the contract price or time was governed by article 6 paragraph 18. Again, that provision directed Dave's to

> carry on the Work and adhere to the progress schedule during all disputes or disagreements with OWNER. No Work shall be delayed or postponed pending resolution of any disputes or disagreements, except as permitted by paragraph 15.04 [not implicated here] or as OWNER and CONTRACTOR may otherwise agree in writing.

Appellant's App. at 503. Dave's' refusal to resume work constituted a breach of the construction contract.

Liberty Mutual's contention that the City failed to investigate the differing subsurface condition claim is likewise without merit. The contract does not require the City to "investigate" the physical site. Instead, section 4.03.B requires the City to "review the pertinent condition[,]" here, the existence of sand and gravel at part of the

14

excavation site. Id. In the July 6 letter, the engineer stated that it was doing just that, namely, "reviewing [Dave's'] claim[.]" Id. at 350.

Still, in response to the engineer's July 6 letter, Dave's' counsel sent a letter reiterating the position that the engineer was "required to investigate the site, perform the necessary testing and investigatory work so as to determine the extent and nature of the differing site condition" and that under section 4.03 it "is not possible for the work to be recommenced until the differing site condition issue ha[d] been resolved." Id. at 348. As we have previously noted, the engineer replied to Dave's on July 9:

> Please be aware that [neither] we nor the City agree with the interpretation of your legal council [sic] that you can refuse to re-commence work on the project on Monday, July 12, 2004[,] as previously agreed. There will be no additional tests or other subsurface investigation provided by the Owner [the City] as such investigation was otherwise your responsibility if deemed necessary prior to committing to the Contract Price and Time.

Id. at 350 (emphasis added). On that same date, the engineer sent its report to the City, with a copy to Dave's, stating that

> the existence of sand and gravel subsurface conditions as well as groundwater conditions does not differ materially from conditions ordinarily encountered and generally recognized as inherent in the work in the Contract Documents. In short, we believe that difficult soil conditions are often-times [sic] encountered in sanitary sewer and watermain installation projects and that these conditions are possible and inherent in this type of construction.
>
> In addition, Section 4.03.C of the Contract General Conditions states that "Contractor shall not be entitled to any adjustments in the Contract Price or Contract Time if:
>
>> The existence of such conditions could reasonably have been discovered or revealed as a result of any examination, investigation, exploration, test or study of the Site and contiguous areas required by the Bidding Requirements or

15

Contract Documents to be conducted by or for the Contractor
prior to the Contractor's making such final commitment.

Id. at 879 (emphases added). The engineer then concluded that the contract "does not

allow for additional payment or time" for the affected portion of the Project, although the

engineer "believe[d] that the City's consideration of assisting with overages related to

[unexpected additional asphalt] restoration" was reasonable.[6] Id. at 880-81.

In sum, Dave's' refusal to return to work when directed to do so constituted a

breach of section 4.03.A of the construction contract. And the City did not breach the

construction contract under section 4.03.B. That section required the City to "review the

pertinent condition[,]" which it did when the engineer reviewed the claim and determined

that Dave's was not entitled to a price or time adjustment. Nor did the City breach

section 4.03.C of the contract. Dave's represented in the Agreement Between Owner and

Contractor that, when it executed the construction contract, it had "familiarized [itself]

with the nature and extent of the . . . work, site, and . . . all local conditions . . . that in any

manner may affect cost, progress or furnishing of the work[.]" Id. at 247. Yet Dave's

then complained of a condition that the engineer determined "did not differ materially

from conditions ordinarily encountered and generally recognized as inherent in the work

in the Contract Documents." Id. at 879. Section 4.03.C.2.b provides that Dave's was not

---

[6] Liberty Mutual contends that "the Engineer declared that neither 'Dave's Excavating nor the other bidders for the project reasonably anticipated' the sandy conditions." Appellant's Brief at 19-20 (emphasis added). Liberty mischaracterizes the engineer's July 9, 2004, report to the City. The engineer unequivocally concluded that Dave's was not entitled to additional cost or time with regard to claims based on differing subsurface conditions or to the claim for additional asphalt restoration cost. But the engineer also suggested that the request for additional asphalt restoration cost was "reasonable" given that neither "Dave's Excavating nor the other bidders for the project reasonably anticipated replacement of most if not all of the roadway surface in certain areas." Appellant's App. at 880 (emphasis added). Liberty Mutual's substitution of the underlined portion of that statement with the words "the sandy conditions" was inaccurate.

entitled to a price or time adjustment where, as here, the circumstances underlying the adjustment claim were foreseeable and Dave's had affirmed that it had informed itself of the conditions of the worksite before executing the contract. The evidence shows that Dave's breached section 4.03 of the contract and that the City did not. Therefore, the trial court did not err when it granted summary judgment that Dave's is liable to the City for breach of the construction contract.

**Issue Two: Performance Bond Liability**

Liberty Mutual next contends that the trial court erred when it concluded that it was liable to the City as surety under the performance bond. In particular, Liberty Mutual asserts that the City did not "afford Liberty Mutual its contractual right to elect how it would mitigate damages." Appellant's Brief at 31. But a review of the undisputed facts shows that Liberty Mutual failed to exercise any of its options to mitigate under the performance bond.

The relevant paragraphs of the performance bond provide:

3        If there is no Owner Default, the Surety's obligation under this Bond shall arise after:

> 3.1     The Owner has notified the Contractor and the Surety . . . that the Owner is considering declaring a Contractor default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default; and

3.2　The Owner has declared a Contractor default and formally terminated the Contractor's right to complete the contract.　Such Contractor Default shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in Subparagraph 3.1; and

3.3　The Owner has agreed to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to perform the Construction Contract in accordance with the terms of the contract with the Owner.

4　When the Owner has satisfied the conditions of Paragraph 3, the Surety shall promptly and at the Surety's expense take one of the following actions:

4.1　Arrange for the Contractor, with consent of the Owner, to perform and complete the Construction Contract; or

4.2　Undertake to perform and complete the Construction Contract itself, through its agents or through independent contractors; or

4.3　Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and the contractor selected with the Owner's concurrence . . . and pay to the Owner the amount of damages as described in Paragraph 6 in excess of the Balance of the Contract Price incurred by the Owner resulting from the Contractor's Default; or

4.4　<u>Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances</u>:

.1　After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, tender payment therefor to the Owner; or

> .2 Deny liability in whole or in part and
> notify the Owner citing reasons therefor.

Appellant's App. at 514 (emphasis added).

Liberty Mutual first contends that paragraph 3 of the bond was never activated because the City defaulted on the construction contract. As discussed above, we have determined that Dave's, not the City, breached the contract. As such, Liberty Mutual's argument under paragraph 3 must fail.

Liberty Mutual next argues that the City "usurped [Liberty Mutual's] right to mitigate its damages" when it sought bids from completion bidders and ultimately hired another contractor to complete the work. Appellant's Brief at 33. Liberty Mutual further argues that the City did not comply with the bond when seeking recovery under it and that such conduct by the City caused prejudice to Liberty Mutual, "nearly doubling the cost of the Project after a significant portion had already been completed[.]" Id. But the facts belie those assertions. Indeed, a review of the timeline of events shows that the City's efforts in obtaining bids and hiring Eagle Valley to complete the Project mitigated its damages and complied with the terms of the performance bond and that Liberty Mutual did not act promptly as required to assert its rights under the bond.[7]

Again, on July 15, 2004, the engineer, on behalf of the City, sent a letter to Dave's and to Liberty Mutual notifying them that the City was considering declaring Dave's in default of the construction contract. The letter referred to paragraph 3.1 of the

---

[7] Liberty Mutual alleges that the City did not mitigate but actually increased its damages. Specifically, Liberty Mutual asserts that the City's actions were "actually prejudicial" because the total cost of completing the project exceeded the amount of the performance bond. Liberty Mutual asserts that the costs for the project increased, but Liberty Mutual has not shown that the increase was attributable to the City.

19

performance bond and requested a meeting within fifteen days. Liberty Mutual responded on July 22, requesting a meeting date outside of the fifteen-day period. That meeting occurred on August 4. When the parties were not able to resolve their issues at that meeting, the engineer sent a letter to Liberty Mutual on August 9 giving notice that the City had declared Dave's in default of the construction contract and had terminated the contract.

Meanwhile, on July 19, 2004, the City's Board of Works and Safety voted to declare the Project an emergency and to solicit bids from other contractors to complete the Project. The City accepted bids in late July and, on July 29, the City held a pre-quotation meeting with four potential completion bidders.

On August 9, following a vote by the Board of Works and Safety, the City gave Dave's written notice that it had "declared a Contractor Default and formally terminated [Dave's] right to complete the contract." Id. at 569. The City sent a copy of the notice to Liberty Mutual. That correspondence also informed Liberty Mutual that the City had declared the Project an emergency, that the City was scheduled to receive completion bids on August 11, and that the City "demand[ed] that [Liberty Mutual] perform its obligations as required by Paragraph 4 of the [performance b]ond." Id. at 108. In a letter dated August 10, Liberty Mutual informed the City that it was investigating the City's claim on the performance bond "under a strict reservation of all rights and defenses under the bond and common law[.]" Id. at 210. Liberty Mutual also "call[ed] on [the City] to mitigate [its] damages[.]" Id.

On August 16, the City's Board of Works and Safety awarded the completion bid contract to Eagle Valley, Inc. at a contract price of $1,215,000. Eagle Valley immediately began work on the Project and completed the work on December 16, 2004, more than five months ahead of schedule and weeks in advance of the statutory deadline. Eagle Valley completed the work at a rate nearly 100 feet per day faster than Dave's actual rate.

On March 29, 2005, the City gave its written demand to Liberty Mutual for payment under the performance bond. Specifically, the City sought $427,524.54, the amount paid in excess of the unpaid balance on Dave's contract. On April 29 Liberty Mutual responded, stating that it had received the March 29 letter, postmarked April 25, on April 28. The letter also requests additional information before Liberty Mutual "will begin [its] evaluation of [its] obligation under the terms and conditions of the bond." Id. at 606. Under section 4.4, Liberty Mutual was required to act promptly. But Liberty Mutual has not shown that it ever reported the results of its investigation to the City, nor did Liberty Mutual deny liability before the City filed its complaint on January 6, 2006, some sixteen months after August 9, 2004, when the City had first demanded that the surety perform its obligation under the bond.

The correspondence outlined above shows that the City gave Liberty Mutual notice of possible default on July 15, 2004 (bond paragraph 3.1); attempted to meet with Liberty Mutual within fifteen days of that notice (bond paragraph 3.1); terminated Dave's' contract no fewer than twenty days later on August 9 (bond paragraph 3.2); and hired a replacement contractor on August 16 (bond paragraph 3.3). By hiring a

21

replacement contractor, the City worked to mitigate its damages—as instructed in Liberty Mutual's August 10 letter—and in fact hired a contractor that worked faster than Dave's had and completed the Project ahead of schedule.

Moreover, Liberty Mutual did not act promptly in asserting its rights under paragraph 4 of the performance bond. Significantly, while Liberty Mutual asserted on August 10, 2004, that it was investigating the City's claim on the bond, it has not shown that it ever provided the City with the results of its investigation or that it ever denied liability in whole or in part and notified the City of its reasons. And the City waited well over one year before filing its complaint to recover under the bond. Liberty Mutual failed to exercise its rights under paragraph 4. As a result, under paragraph 5 of the bond, the City is "entitled to enforce any remedy available" to it. Id. at 514.

Still, Liberty Mutual cites the holding of Town of Plainfield v. Paden Engineering Co., 943 N.E.2d 904 (Ind. Ct. App. 2011), trans. denied, in support of its argument that the City's failure to "afford Liberty Mutual its contractual right to elect how it would mitigate damages" renders the trial court's entry of summary judgment in favor of the City in error. Appellant's Brief at 31. In Paden we held that a contractor and its sureties had no liability for a breach of contract where the town had not satisfied a condition precedent before terminating a public construction contract. Id. at 914. But the failure to perform a condition precedent is an affirmative defense that must be specifically and particularly asserted in a responsive pleading. Ind. Trial Rule 9(C); see also Collins v. McKinney, 871 N.E.2d 363, 369 n.3 (Ind. Ct. App. 2007), trans. denied. Liberty Mutual did not assert with its answer an affirmative defense that the City had failed to comply

22

with any condition precedent. Thus, Liberty Mutual waived any argument that the City failed to perform a condition precedent. Waiver notwithstanding, we consider Liberty Mutual's argument under Paden on the merits.

The facts in Paden are clearly distinguishable. Here, as discussed in detail above, the City satisfied the conditions precedent in the performance bond when it timely contacted Liberty Mutual and, on Liberty Mutual's instructions, proceeded to mitigate its damages by hiring a replacement contractor. And, again, Liberty Mutual did not timely exercise any of its contractual options to mitigate damages but asked the City to mitigate. The City proceeded accordingly and was able to secure completion of the Project ahead of schedule. Thus, Liberty Mutual's reliance on Paden is misplaced.

In sum, Liberty Mutual has not shown that it asserted its rights to elect how to mitigate damages "promptly." See Appellant's App. at 514. Nor has Liberty Mutual shown that the City failed to comply with any conditions precedent before making a claim under the performance bond. As such, Liberty Mutual has not shown that the trial court erred when it entered summary judgment in favor of the City on its claim asserted against Liberty Mutual.

### Issue Three: Attorney's Fees

Finally, Liberty Mutual contends that the trial court erred when it entered summary judgment in favor of the City and against Liberty Mutual on the issue of attorney's fees. Specifically, Liberty Mutual argues that the City should not have been

awarded attorney's fees because the City did not comply with section 15.02 of the construction contract.[8] Again, we cannot agree.

Section 15 of the construction contract pertains to the City's termination of the contract for cause. Liberty Mutual relies on section 15.02.B of the contract, which provides:

> If one or more of the events identified in paragraph 15.02.A occur, OWNER may, after giving CONTRACTOR (and the surety, if any) seven days['] written notice, terminate the services of CONTRACTOR, exclude CONTRACTOR from the Site, and take possession of the Work and of all CONTRACTOR's tools, appliances, construction equipment, and machinery at the Site, and use the same to the full extent they could be used by CONTRACTOR (without liability to CONTRACTOR for trespass or conversion), in corporate in the Work all materials and equipment stored at the Site or for which OWNER has paid CONTRACTOR but which are stored elsewhere, and finish the Work as OWNER may deem expedient. In such case, CONTRACTOR shall not be entitled to receive any further payment until the Work is finished. If the unpaid balance of the Contract Price exceeds all claims, costs, losses, and damages (including but not limited to all fees and charges of engineers, architects, attorneys, and other professionals and all court or arbitration or other dispute resolution costs) sustained by OWNER arising out of or relating to completing the Work, such excess will be paid to CONTRACTOR. If such claims, costs, losses, and damages exceed such unpaid balance, CONTRACTOR shall pay the difference to OWNER. <u>Such claims, costs, losses, and damages incurred by OWNER will be reviewed by ENGINEER as to their reasonableness and, when so approved by ENGINEER, incorporated in a Change Order</u>. When exercising any rights or remedies under this paragraph OWNER shall not be required to obtain the lowest price for the Work performed.

Appellant's App. at 510-11 (emphasis added). The contract defines the following relevant terms:

---

[8] The City also contends that Liberty Mutual waived any defense based on the City's purported failure to satisfy conditions precedent because Liberty Mutual failed to plead that defense specifically and with particularity as required by Indiana Trial Rule 9(C). The City is correct. Nevertheless, we exercise our discretion to consider on the merits Liberty Mutual's contention that the City did not comply with the terms of the bond with regard to the claim for attorney's fees.

9.      Change Order—A document recommended by ENGINEER which is signed by CONTRACTOR and OWNER and authorizes an addition, deletion, or revision in the Work or an adjustment in the Contract Price or the Contract Times, issued on or after the Effective Date of the [contract].

10.     Claim—A demand or assertion by OWNER or CONTRACTOR seeking an adjustment of Contract Price or Contract Times, or both, or other relief with respect to the terms of the Contract. A demand for money or services by a third party is not a Claim.

Appellant's App. at 484.

Liberty Mutual contends that, with regard to the request for attorney's fees, the City "failed to submit even the 'general nature' of its claim to the Engineer or Dave's Excavating, failed to obtain a decision of 'reasonableness' from the Engineer, and did not incorporate the claim in a Change Order, as required by the Contract." Appellant's Brief at 27. Liberty Mutual misconstrues section 15.02 of the construction contract. A change order results in an addition, deletion, or revision in the "Work" or an adjustment in the "Contract Price," the "Contract Times," or both. A change order as used in the contract does not contemplate a request for attorney's fees. The definition of "claim" used in the construction contract also does not contemplate attorney's fees. Such fees are derivative of the transaction memorialized in the contract, but they are not the "relief" referred to in the definition of "claim."

Moreover, Liberty Mutual's argument that the contract requires an engineer to review attorney's fees for reasonableness defies common sense. Attorney's fees are reviewed for reasonableness by other attorneys. And the engineer employed by the City is not alleged to have any expertise in reviewing attorney's fees.

Liberty Mutual also relies on <u>Weigand Constr. Co. v. Stephens Fabrication, Inc.</u>, 929 N.E.2d 220 (Ind. Ct. App 2010), in support of its contention that summary judgment in favor of the City regarding attorney's fees was in error. In <u>Weigand</u>, the fabricator made a claim for additional compensation outside the time period required under the contract between the parties. Also, the fabricator had continued to work after submitting its untimely claim for additional compensation, despite a contract provision requiring the cessation of work following a claim for an increase in the contract price. This court held that the fabricator was not entitled to an increase in the contract price due to the untimely claim and the violation of the cessation-of-work provision. <u>Id.</u> at 227-28.

The holding in <u>Weigand</u> is inapposite. Here, again, the construction contract did not require the City to submit a "claim" for attorney's fees to the engineer for a determination of reasonableness. Indeed, the claim procedures Liberty Mutual relies on do not apply to attorney's fees. The City did not fail to comply with relevant contract provisions, and, thus, the trial court did not err when it granted summary judgment in favor of the City and awarded attorney's fees.

## Conclusion

The trial court correctly entered summary judgment that Dave's is liable to the City for breach of the construction contract. Dave's breached the construction contract when it refused to return to work after receiving orders to do so. The court also correctly entered summary judgment that Liberty Mutual is liable to the City for Dave's' breach as surety on the performance bond. The City complied with its obligations under the performance bond. Moreover, Liberty Mutual specifically directed the City to mitigate

26

its damages, which it did by hiring another contractor to complete the Project. Finally, Liberty Mutual has not shown that the City failed to comply with the contract in seeking attorney's fees, and the trial court did not err when it granted summary judgment for the City on that issue.

Affirmed.

RILEY, J., and MAY, J., concur.