# FOR PUBLICATION

Jun 27 2014, 9:30 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANTS:

**DAVID C. CAMPBELL**
**PHILLIP J. FOWLER**
**MEAGHAN KLEM HALLER**
Bingham Greenebaum Doll LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**MARC E. KASOWITZ**
**CINDY C. KELLY**
**ANDREW A. DAVENPORT**
**KEVIN A. CYRULNIK**
Kasowitz, Benson, Torres & Friedman LLP
New York, New York

**DOUGLAS A. WELP**
Bamberger, Foreman, Oswald & Hahn LLP
Evansville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ALAN R. BRILL, BUSINESS MANAGEMENT CONSULTANTS, LP f/k/a BRILL MEDIA COMPANY, LP, and the NON-DEBTOR COMPANIES, | ) ) ) ) ) | |
| Appellants-Plaintiffs/Cross-Appellees, | ) ) | |
| vs. | ) ) | No. 82A01-1304-PL-174 |
| REGENT COMMUNICATIONS, INC., n/k/a TOWNSQUARE MEDIA, INC., | ) ) ) ) | |
| Appellee-Defendant/Cross-Appellant. | ) | |

APPEAL FROM THE VANDERBURGH SUPERIOR COURT
The Honorable Richard G. D'Amour, Judge
Cause No. 82D03-0808-PL-4636

**June 27, 2014**

**OPINION - FOR PUBLICATION**

**BARNES, Judge**

**Case Summary**

Alan R. Brill, Business Management Consultants, LP, f/k/a Brill Media Company, LP, and the Non-Debtor Companies (collectively "Brill") appeal the trial court's order granting summary judgment in favor of Regent Communications, Inc., n/k/a Townsquare Media, Inc., ("Regent") in an action for breach of contract and fraud. Regent cross-appeals, claiming that the trial court erred in denying its motion to dismiss Brill's second amended complaint as untimely under Virginia's statute of limitations.[1] We reverse.

**Issues**

The dispositive issue we address is whether the trial court properly denied Regent's motion to dismiss Brill's complaint.[2] We also address whether the trial court properly granted summary judgment in favor of Regent.

---

[1] We heard oral argument on May 13, 2014. We thank the parties for their preparation and commend them for their excellent presentations.

[2] Brill also challenges the trial court's rulings on the parties' motions to strike certain claims and designated evidence. We will discuss the parol evidence issue only as it pertains to summary judgment. Because of our holding, we need not address Brill's claims concerning lost rental income or illegal contact between Regent and certain third parties, except to note that we in no way espouse a view in favor of returning to the days preceding Indiana's notice pleading rules.

2

**Facts**[3]

Brill was the owner of radio stations and newspapers in medium markets such as Evansville. In 2000, Brill sought to sell the radio stations and began negotiating with Regent, a publicly-held company that owned and operated radio stations throughout the country. At that time, the parties understood that Regent was interested in purchasing all of Brill's radio stations. During the course of the negotiations, Brill submitted financial and other confidential information to Regent. On June 16, 2000, Brill drafted a confidentiality agreement ("2000 Agreement"), pursuant to which Regent agreed in pertinent part:

> A. Proprietary Information, as used herein, shall mean any and all written or documentary information that (1) relates to the above-identified Subject Matter [confidential information concerning the radio stations]; and (2) is disclosed by Brill Media to Regent.
>
> B. Neither party shall have any obligation with respect to Proprietary Information or elements thereof disclosed which:
>
>> 1. are already known to the receiving party as evidenced by prior documentation thereof; or
>>
>> 2. are publicly known through no wrongful act of recipient; or
>>
>> 3. are rightfully received by Regent without restriction from a third party not subject to any

---

[3] The statement of facts sections of the parties' briefs contain argument, as does Regent's statement of the case. We remind counsel that the statement of facts shall be limited to a narrative description of the relevant facts stated in accordance with the appropriate standard of review, Ind. Appellate Rule 46(A)(6), and the statement of the case shall be limited to a brief description of the nature of the case, course of proceedings, relevant issues, and disposition of those issues. App. R. 46(A)(5). In fact, the parties' briefs as a whole are condescending in tone. We also remind counsel that the purpose of appellate briefs is to present this Court with concise arguments supported by statutory law, case law, and the record. App. R. 46(A)(8). "Invectives are not argument, and have no place in legal discussion . . . ." Pittsburgh, Cincinnati, Chicago & St. Louis Ry. Co. v. Muncie & Portland Traction Co., 166 Ind. 466, 468, 77 N.E. 941, 942 (1906).

contractual or legal obligation to maintain the Proprietary Information as confidential; or

4.      are approved for release by written authorization of Brill Media.

C.      Except to its directors, officers, employees, agents, attorneys, accountants, advisors, prospective bank or institutional lenders and investors (collectively "Representatives"), Regent shall not disclose to any third party, or permit others to use or use for any purpose other than that identified above, any Proprietary Information or elements thereof at any time.  Regent shall not be liable for inadvertent disclosure of Proprietary Information provided that (1) Regent uses at least the same degree of care in safeguarding such Proprietary Information as it uses for its own proprietary information of like importance and such degree of care [as] is reasonably calculated to prevent such inadvertent disclosure, (2) Regent limits access to such Proprietary Information to its Representatives who have a need to know and informs any persons who have access to such Proprietary Information of the duty not to disclose, and (3) upon discovery of any such inadvertent disclosure of Proprietary Information, Regent endeavors to prevent any further inadvertent disclosure.

D.      All Proprietary Information in any form and in any manner disclosed by Brill Media, including, but not limited to, documents, accounts, financial records, financial statements, customer lists, business methods, employee matters, and the like shall remain the property of Brill Media.  Upon written request by Brill Media, Regent shall return to Brill Media all tangible forms of the Proprietary Information, including any and all copies thereof, and Regent shall destroy any analyses or reports of Regent that contain or reflect any of the Proprietary Information.

E.      Regent shall not at any time make use of any Proprietary Information regarding the Proposed Transaction which shall have been disclosed to Regent by Brill Media to make contact with, solicit or enter into a business relationship with any person or entity not a party to the Proposed Transaction.

4

Appellants' App. pp. 1443-44.  The 2000 Agreement defines "Proposed Transaction" as Regent's expressed "interest in purchasing certain radio station assets and/or stock from [Brill] . . . ."  Id. at 1443.

By the end of 2001, Brill's bondholders ("Bondholders") and creditors formed a committee ("Creditors Committee") to investigate filing an involuntary Chapter 7 bankruptcy against some of Brill's radio stations and newspapers (respectively "Debtor Stations" and "Debtor Newspapers," collectively "Debtor Affiliates").  The Creditors Committee sought Regent's help in devising a plan to stave off bankruptcy or in working out an arrangement wherein Regent would purchase Brill's Debtor Affiliates.  On January 11, 2002, investment banking firm Jefferies & Co. made a presentation to Regent called "Project Hoosier," which outlined a two-step procedure where "Alan Brill transfers his radio assets for cancellation of intercompany obligations plus assumption of the exercise option[,]" and Brill's radio assets are sold to Regent  Id. at 1569.  No pre-bankruptcy agreement was reached, and on January 17, 2002, the Bondholders filed an involuntary Chapter 7 petition against the Debtor Affiliates in the United States Bankruptcy Court for the Southern District of Indiana.

During the spring of 2002, Brill and Regent continued to negotiate a possible sale concerning Brill's radio stations.  Meanwhile, investment banking firm Robertson Stephens prepared for Regent a report titled "Brill Media Co LLC Meeting Notes."  Id. at 1590.  The report was a financial model containing Brill's income statement, cash flow, and balance sheet, along with a debt overview and revenue breakdown by radio station.  At the same time, the bankruptcy court adopted a plan to liquidate the Debtor Affiliates at auction ("the

5

Auction"). In preparation for the August 2002 Auction, the Bankruptcy Administrative Officer ("BAO") sought information from Brill to be made available to potential bidders as part of their due diligence. In May 2002, Regent submitted its bidder's request for that information from the BAO. Shortly thereafter, Brill provided the BAO with the requested information to make available to the potential bidders. On May 10, 2002, Regent and the BAO signed a Debtors Agreement, which contained provisions addressing the designation and use of confidential information concerning the Debtor Affiliates as well as a nondisclosure provision pertaining to the same. Id. at 449.

In June 2002, Brill and Regent negotiated concerning a potential bidding partnership at the upcoming Auction. On July 8, Brill requested another confidentiality agreement ("2002 Agreement") with Regent that Regent signed on July 11, 2002. The 2002 Agreement states in pertinent part:

> Regent Communications, Inc. or one of its subsidiaries or affiliates ("Regent" or "You" or "Your") is interested in and may pursue in-depth and ongoing discussions with Alan Brill ("ARB") and/or Brill Media Company, LP and/or their Non-Debtor Affiliates (ARB, Brill Media Company, LP and the Non-Debtor Affiliates together, the "Company") for the purpose, directly or indirectly, of acquiring or controlling by itself or with You all or part of the radio and newspaper properties and related assets of Brill Media Company, LLC and Subsidiaries ("the Debtors") and of ARB by assets purchase, by reorganizations of Debtors, by acquisition and or control of Debtors' and/or ARB's equity interests and/or liabilities, and/or any other form of similar involvement that Regent could have relative to working with Company for control of the Debtors' properties (any or all of the foregoing being the "Transaction"). The Company and Debtors together are "Brill"; the Company with Regent are the "Buyers."

1.    In consideration of initial discussions regarding a role, and potentially as a participant, in the Transaction, Regent acknowledges that Company will be disclosing to Regent confidential proprietary information regarding the Company's non-public affairs including finances, operations, personnel, distribution arrangements, customer lists and plans whether in writing or orally, specifically including intentions, tactics and strategies with respect to the Transaction (the foregoing and the fact that such discussions are even taking place, the "Information") and agrees to maintain the confidentiality of the Information of [sic] which Regent has been entrusted. Regent is subject to the terms of a separate Confidentiality Agreement with respect to confidential information regarding the Debtors, and such agreement shall remain in full force and effect and shall control with respect to Regent's use of such Confidential Information.

2.    The term "Information" shall not include such portions thereof which (a) are or become available to the public other than as a result of a disclosure by Regent or Regent Representatives or (b) presently are or hereafter become available to Regent on a non-confidential basis from another source which, to Regent['s] knowledge, is not subject to a confidentiality agreement or (c) subject to paragraph 5 below, is required to be disclosed before any regulatory agency, court or other tribunal.

3.    Regent, for itself and for its officers, agents, representatives and employees, acknowledges and agrees that said Information is confidential. Regent agrees to keep confidential and not to disclose, divulge, provide or make accessible any of the Information, except as provided herein, to any other person, firm or company not connected with Regent in its evaluation of the Transaction, without prior written authorization from [Alan Brill]; Regent further agrees not to use, or permit the use of, any of the Information in a manner detrimental to [Alan Brill] or for a purpose other than for an evaluation of Regent involvement in the Transaction, whatever form that may take.

\* \* \* \* \*

7

6.	Regent shall not contact or otherwise communicate with Brill's officers, employees, representatives, agents, bankruptcy representatives or professionals, suppliers, customers, potential acquirers, or creditors with respect to any matter relating to the Information or the Transaction without prior written consent from [Alan Brill] provided however, that nothing contained in this Confidentiality Agreement shall in any way limit Regent's right to make reasonable inquiry of any person, firm or company, specifically including the Debtors, the [Creditors Committee], and any representatives thereof, as Regent deems reasonably necessary in connection with the due diligence concerning the Transaction or Regent's potential participation in the Transaction; providing further, however, that Regent shall provide reasonable advance notice to [Alan Brill] of each such inquiry and shall afford [Alan Brill] a reasonable opportunity to participate with Regent in each inquiry. Regent shall not make any disclosure of any of the Information without the express prior written consent of [Alan Brill].

* * * * *

9.	The restrictions contained in this Confidentiality Agreement shall continue for so long as Regent is working to assist Company in this Transaction and for the one-year period immediately thereafter.[4]

Id. at 1008-10.

Throughout July 2002, Brill and Regent exchanged emails concerning the upcoming Auction. By the end of July, negotiations had stalled. Regent eventually partnered with 21st Century for the Auction, and Brill partnered with Cumulus Media ("Cumulus"). Regent and 21st Century submitted the highest bid at Auction, with Regent acquiring the Debtor Stations and 21st Century acquiring the Debtor Newspapers.

---

[4] The 2000 Agreement does not specify any duration.

8

On August 20, 2008, Brill filed an action in the trial court against Regent and numerous other defendants for breach of contract, fraud, and other enumerated acts of malfeasance.[5] In September 2008, Brill filed an amended complaint, and the cause was removed to the bankruptcy court, which was still presiding over Brill's bankruptcy. On January 19, 2009, Brill filed a second amended complaint naming Regent as the sole defendant and narrowing its theories of recovery to breach of contract, fraud, unjust enrichment, and promissory estoppel. Regent filed a motion to strike the second amended complaint, and the bankruptcy court determined that it lacked subject matter jurisdiction and remanded the case to the trial court. Regent appealed the bankruptcy court's decision first to the United States District Court for the Southern District of Indiana and then to the Seventh Circuit Court of Appeals, which dismissed the appeal. See Regent Commc'ns, Inc. v. Brill, No. 3:09-CV-61-RLY-WGH, 2010 WL 3025031 (S.D. Ind. July 30, 2010); Townsquare Media, Inc. v. Brill, 652 F.3d 767 (7th Cir. 2011). The cause proceeded in the trial court.

In August 2010, Regent filed an Indiana Trial Rule 12(B)(6) motion to dismiss Brill's second amended complaint, claiming that it was time-barred, that fraud was insufficiently pled, that promissory estoppel is not recognized under Virginia law, and that unjust enrichment is not recognized where a valid contract exists. The trial court denied Regent's motion. In May 2011, Regent filed a motion for reconsideration and/or clarification, and the trial court dismissed Brill's claims for unjust enrichment and promissory estoppel. Regent requested certification of the trial court's denial of its motion to dismiss for interlocutory

---

[5] Alan Brill initially proceeded pro se. He eventually retained counsel and filed a second amended complaint.

9

appeal. The trial court denied certification. In November 2012, Regent filed a motion to strike a portion of a report by Brill's expert pertaining to Brill's purported loss of $5,000,000 in lost rent, which the trial court granted.

In January 2013, Regent filed a motion for summary judgment. In March 2013, Brill filed a brief in opposition, claiming that Regent breached the Agreements by engaging in contacts with third parties. Brill also filed a motion to strike the portions of Regent's brief in support of summary judgment that referenced parol evidence. Regent filed motions to strike new claims of breach of contract advanced in Brill's brief in opposition to summary judgment and a new damage claim for lost rental income outlined in Brill's expert report. In April 2013, the trial court held a hearing on all pending motions and eventually denied Brill's motion to strike and granted both Regent's motion to strike and its motion for summary judgment. This appeal and cross-appeal ensued.

## Analysis

### I. Cross-Appeal: Statute of Limitations

We first address Regent's cross-appeal contention that the trial court erred in denying its Indiana Trial Rule 12(B)(6) motion to dismiss Brill's second amended complaint as time-barred by Virginia's statute of limitations. See Va. Code § 8.01-246(2) ("In actions on any contract which is not otherwise specified and which is in writing and signed by the party to be charged thereby, or by his agent, [the action shall be brought] within five years whether such writing be under seal or not."); but cf. Ind. Code § 34-11-2-11 (requiring that an action on written contract other than for payment of money must be commenced within ten years of

10

accrual).[6]

Here, the 2000 Agreement and 2002 Agreement contain nearly identical choice of law provisions: "This Agreement shall be interpreted and the rights of the parties determined under the laws of the Commonwealth of Virginia without regard to the conflict of law provisions thereof." Appellants' App. p. 1444 (2000 Agreement). "This Confidentiality Agreement shall be governed by and construed in accordance with the internal laws of the Commonwealth of Virginia (without regard to any conflict of law provisions thereof)." Id. at 1010 (2002 Agreement). The parties agree that Virginia law controls the substantive issues; however, they disagree concerning which state's law controls procedural issues such as statutes of limitations.[7]

Interpretation and construction of contract provisions are questions of law. Fischer v. Heymann, 943 N.E.2d 896, 900 (Ind. Ct. App. 2011), trans. denied. We review the contract as a whole, ascertaining the parties' intent, and making every attempt to construe the contract's language "so as not to render any words, phrases, or terms ineffective or meaningless." Id. (quotation omitted). Generally, Indiana courts will give effect to the

---

[6] Regent contends that "Brill's fraud claim sounds in contract and is therefore subject to the same statute of limitations. (See Appellee's App. 14-16)." Appellee's Br. p. 44 n.22. Even if it is not, Virginia Code § 8.01-248 provides, "Every personal action . . . for which no limitation is otherwise prescribed, shall be brought within two years after the right to bring such action has accrued." Actions for fraud shall be deemed to accrue when such fraud "is discovered or by the exercise of due diligence reasonably should have been discovered[.]" Va. Code Ann. § 8.01-249; but cf. I.C. § 34-11-2-7(4) (stating action for relief against fraud must be commenced within six years after accrual).

[7] The parties agree that statutes of limitations are classified as procedural rather than substantive. See Horvath v. Davidson, 148 Ind. App. 203, 209, 264 N.E.2d 328, 332 (1970) ("Without exception the statute of limitations has been considered procedural in Indiana."); see also Bailey v. Skipperline Indus., Inc., 278 F. Supp. 2d 945, 953 (N.D. Ind. 2003) (observing that in breach of contract action statutes of limitations are treated as procedural).

parties' agreement as to controlling law. JKL Components Corp. v. Insul-Reps, Inc., 596 N.E.2d 945, 950 (Ind. Ct. App. 1992), trans. denied; see also TM Delmarva Power, L.L.C. v. NCP of Va., L.L.C., 557 S.E.2d 199, 200 (Va. 2002) ("[N]o word or clause in a contract will be treated as meaningless if a reasonable meaning can be given to it, and parties are presumed not to have included needless words in the contract.").

In arguing that that the choice of law provision applies only to substantive law, Brill relies on JKL, which states, "[A] contract provision that an agreement is to be governed by the law of another state operates only to import the substantive law of that state; the procedural law of the forum state applies to procedural issues." JKL, 596 N.E.2d at 950.[8] Notwithstanding Indiana's adherence to lex fori (law of the forum) concerning procedural issues, Regent submits that the "without regard to conflict of law" provision mandates the application of Virginia law to both substantive and procedural matters. As support, Regent relies on OrbusNeich Med. Co. v. Boston Scientific Corp., 694 F. Supp. 2d 106 (D. Mass. 2010).

In OrbusNeich, the United States District Court for the District of Massachusetts interpreted a contract containing a choice of law provision nearly identical to the one contained in Regent and Brill's Agreements, namely, "'Agreement is governed by the Laws of the Commonwealth of Massachusetts, USA, without regard for the conflicts of law provisions.'" OrbusNeich, 694 F. Supp. 2d at 113 (citation omitted) (emphasis added). As in

---

[8] In JKL, the contract stated that, in the event of a controversy that could not be settled by the parties, "'such controversy or claim shall be settled by arbitration at Los Angeles, California, in accordance with the then current rules of the American Arbitration Association [and] judgment upon the award may be entered in any court having jurisdiction thereof.'" JKL, 596 N.E.2d at 946 (citation omitted).

12

this case, at issue in <u>OrbusNeich</u> was whether the choice of law provision covered only substantive matters or whether it also applied to the statute of limitations, a procedural matter. The <u>OrbusNeich</u> court concluded that the choice of law provision governed the statute of limitations, reasoning in part:

> This court . . . is not at liberty to disregard the parties' addition of the phrase "without regard to the conflicts of law provisions" as [the defendant] has done. It is a canon in the interpretation of contracts that every word and phrase must be presumed to have been employed with a purpose, and must be given a meaning and effect whenever reasonably possible. And this court finds that the phrase "without regard for the conflicts of laws provisions" unambiguously expresses the parties' intention to exclude consideration of <u>all</u> conflicts of law provisions in determining which law to apply to various aspects of a dispute arising under the [Agreement].

> To begin with, the plain language of the phrase "without regard for the conflicts of law provisions," does not confine itself to only those conflicts of law provisions pertaining to the choice of substantive law. If the parties had intended to so confine the phrase, they easily could have done so. Instead, they chose language which, on its face, sweepingly excludes, in the plural, consideration of all conflicts of law provisions in deciding any issue as to governing law. This, in and of itself, indicates to this court that the parties have selected Massachusetts law to govern all aspects of their dispute, without regard to their substantive or procedural nature. Any other conclusion contradicts the plain language of the choice of law provision.

> Moreover, the contrary conclusion—that "without regard to the conflicts of law provisions" only excludes consideration of the choice of law rules pertaining to substantive law—would render the phrase a meaningless redundancy. Had the choice of law provision merely said "this agreement is governed by the laws of Massachusetts," it clearly would have conveyed to this court that the parties intended for Massachusetts substantive law

13

to apply to disputes arising under the contract. The parties needed go no further to express such an intention.

> But, importantly, the language of the [Agreement] did go further. And this court must give meaning and effect to that additional language. It can fathom no other way to do so, but to interpret it as a statement of the parties [sic] intention that this court disregard all conflicts of law provisions that might otherwise apply, in favor of straightforwardly applying Massachusetts law to all issues arising out of the contractual dispute, whether procedural or substantive.

Id. at 114 (internal quotation marks and footnotes omitted).

Regent also cites American Insurance Co. v. Frischkorn, 173 F. Supp. 2d 514, 520 (S.D. W. Va. 2001), where the district court concluded that a choice of law provision applied not only to substantive matters but also to the statute of limitations. There, the provision stated, "'This Agreement shall be governed by and construed in accordance with the laws of the State of California applicable to disputes occurring entirely within such State.'" Frischkorn, 173 F. Supp. 2d at 520 (citation omitted). The Frischkorn court interpreted the highlighted phrase to include all of California law, whether substantive or procedural. Id.

In denying Regent's motion to dismiss, the trial court found in part,

> Since Virginia has a 5 year statute of limitations and this matter was filed after 5 years but before Indiana's 6 year statute of limitations had run, Regent alleges the action is time barred. Regent can cite to no Indiana cases that have interpreted this phrase. Regent does concede that Indiana does follow the doctrine of lex fori [law of the forum] which since the action was brought in Indiana, would require the application of Indiana procedural law. Regent argues that the phrase "without regard to any conflict of law provisions thereof" supercedes [sic] the rule of lex fori.

> Brill argues that the phrase "without regard to any

14

conflict of law provisions thereof" has nothing to do with the statue [sic] of limitations but is used to avoid the problem inherent with the renvoi doctrine. The renvoi doctrine states;

> "that when a question comes before a court which according to the law of the forum as to conflict of laws, is to be determinate by the law of another jurisdiction, the court must take into account the whole law of the other jurisdiction including not only the relevant substantive law of such other jurisdiction but also its rules as to conflict of laws." Maroon v. State Dept. of Mental Health, 411 N.E.2d, 404, 413 (1980).

> Indiana has rejected the renvoi doctrine. Id. at 413. Brill argues that the language "without regard to any conflict of law provisions thereof" is routinely employed to avoid the circular absurdity of the renvoi doctrine. This Court agrees with this argument and therefore denies Regent's final argument to dismiss Brill's Second Amended Complaint.

Appellants' App. pp. 35-36.

The trial court aptly stated that Indiana follows lex fori, the law of the forum, and has rejected the circularity that results from the ancient renvoi doctrine. However, the Maroon case cited in the trial court involved a tort claim, with the question being whether to apply Illinois law or the Indiana Tort Claims Act. Maroon, 411 N.E.2d at 413. As such, unlike the present case, Maroon was not a contract dispute.

Here, the Agreements included the phrase, "without regard to [any/the] conflict of law provisions thereof," and as matter of contract interpretation, we must read the phrase in such a way as to avoid rendering it meaningless. Appellants' App. pp. 1010, 1444. We agree with the OrbusNeich court's reasoning that, where contracting parties intend to include a choice of law phrase merely pertaining to substantive law, they accomplish that end simply by stating

15

that their agreement will be interpreted and the rights of the parties governed by the law of the specified state. OrbusNeich, 694 F. Supp. 2d at 114. In such a case, the lex fori rule would dictate that the forum's procedural law would automatically govern. Id. What the additional phrase accomplishes is to place not only the substantive matters but also the procedural matters under the law of the specified state. We are persuaded by the reasoning in OrbusNeich and conclude that, in adherence to the foundations of contract interpretation, the additional phrase "without regard to conflict of law provisions thereof" must be given meaning. In other words, we deem its inclusion to be an indication of the parties' intent. This is not to say that we take the general position of reverting to the ancient renvoi doctrine; it is merely to say that the parties, as they did here, may by contract dictate an override of lex fori for purposes of a dispute arising out of their particular contract.

Based on the language used by the parties in the Agreements, we conclude that Virginia law governed both the substantive issues and the procedural issues. As such, the parties were subject to Virginia's five-year statute of limitations. Because Brill failed to timely file its complaint, the trial court should have granted Regent's motion to dismiss.

## II. Summary Judgment

### A. Standard of Review

Even if we were to conclude that the the trial court properly denied the motion to dismiss, we would affirm the grant of summary judgment in favor of Regent. In reviewing a trial court's decision to grant or deny summary judgment, we use the same standard as the trial court. Worman Enters., Inc. v. Boone Cnty. Solid Waste Mgmt. Dist., 805 N.E.2d 369,

373 (Ind. 2004). A motion for summary judgment is properly granted only when the pleadings and designated evidence reveal that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Bank of New York v. Nally, 820 N.E.2d 644, 648 (Ind. 2005).[9] In determining whether issues of material fact exist, we must accept as true those facts established by evidence favoring the nonmoving party and resolve all doubts against the moving party. Id. Mere speculation cannot create questions of fact, meaning that "guesses, supposition and conjecture are not sufficient to create a genuine issue of material fact to defeat summary judgment." Beatty v. LaFountaine, 896 N.E.2d 16, 20 (Ind. Ct. App. 2008) (quotation omitted), trans. denied.

Where the parties' disputes concern matters of contract interpretation, they are questions of law. Westfield Cos. v. Knapp, 804 N.E.2d 1270, 1274-75 (Ind. Ct. App. 2004), trans. denied; PBM Nutritionals, LLC v. Lexington Ins. Co., 724 S.E.2d 707, 712 (Va. 2012). Cases involving contract interpretation are particularly appropriate for summary judgment. Knapp, 804 N.E.2d at 1274. When interpreting a written contract, we attempt to determine the intent of the parties at the time the contract was made. Dave's Excavating, Inc. v. City of New Castle, 959 N.E.2d 369, 376-77 (Ind. Ct. App. 2012), trans. denied; Eure v. Norfolk Shipbuilding & Drydock Corp., 561 S.E.2d 663, 668 (Va. 2002).

Both Indiana and Virginia courts apply the four corners rule, which states that, where the language of a contract is unambiguous, the parties' intent is to be determined by

---

[9] We note that Virginia courts apply the same standard in resolving summary judgment cases. Fultz v. Delhaize Am., Inc., 677 S.E.2d 272, 274 (Va. 2009).

17

reviewing the language contained within the "four corners" of the contract and "parol or extrinsic evidence is inadmissible to expand, vary, or explain the instrument unless there has been a showing of fraud, mistake, ambiguity, illegality, duress or undue influence." Adams v. Reinaker, 808 N.E.2d 192, 196 (Ind. Ct. App. 2004) (quotation omitted); Pocahontas Min. LLC v. CNX Gas Co., LLC, 666 S.E.2d 527, 531 (Va. 2008) ("When the writing, considered as a whole, is clear, unambiguous, and explicit, a court asked to interpret such a document should look no further than the four corners of the instrument."). "[T]he prohibition against the use of parol evidence is by no means absolute. Parol evidence may be considered if it is not being offered to vary the terms of the written contract, and to show that fraud, intentional misrepresentation, or mistake entered into the formation of a contract." America's Directories Inc. v. Stellhorn One Hour Photo, Inc., 833 N.E.2d 1059, 1066 (Ind. Ct. App. 2005) (citation omitted), trans. denied.

### B. Nature of the Agreements

Brill drafted and both parties signed two confidentiality agreements—the 2000 Agreement and the 2002 Agreement. Throughout the proceedings, Brill has characterized Regent's participation in the Auction as a breach of those agreements.[10] It is important to address the nature of the Agreements: they were nondisclosure agreements, not noncompete

---

[10] Brill also characterizes Regent's conduct as fraudulent. With respect to its fraud claim, Brill asserts that Regent "entered into the 2002 Agreement to induce Brill to provide Regent with additional confidential information that would assist Regent in bidding at the Auction against Brill." Appellants' Br. p. 42. This fraud in the inducement argument is curious, considering that Brill (not Regent) drafted the 2002 Agreement and that it covered only the Non-Debtor Affiliates, which were not the subject of the Auction sale.

18

agreements. The designated evidence shows that Brill pursued other potential buyers.[11] Brill acknowledges this point but asserts that, while Brill was not prohibited from courting other suitors, Regent was prohibited from doing so. The Agreements are devoid of any language indicating the parties' intent to deal exclusively with each other. Moreover, as discussed below, the Agreements were limited in scope and subject matter, even vis-à-vis their disclosure prohibitions.

### 1. The 2002 Agreement

Brill contends that the 2002 Agreement prohibited Regent from attending and bidding against it at the bankruptcy Auction. As support, Brill refers to the 2002 Agreement's broad definition of "Transaction" and Regent's agreement "not to use . . . any of the Information in a manner detrimental to [Alan Brill] or for a purpose other than for an evaluation of Regent involvement in the Transaction, whatever form that may take." Appellants' App. p. 1009. Notwithstanding the seemingly broad definition of "Transaction," the Agreement defined "Company" narrowly as, "[Alan Brill], Brill Media Company, LP and the <u>Non-Debtor Affiliates</u>" collectively. <u>Id.</u> at 1008 (emphasis added). The 2002 Agreement explained that the Company would be disclosing "confidential propriety information regarding the Company's non-public affairs," and Regent agreed to maintain the confidentiality of that information. <u>Id.</u> The 2002 Agreement also specifically stated that Regent was subject to a separate confidentiality agreement regarding the Debtor Affiliates. <u>Id.</u>

---

[11] <u>See</u> Appellants' App. p. 570 (referring to Alan Brill's email stating "we are going to the prom on Friday with a date[,] but we just don't know which one yet[,] but there will be one[,] and we can't just select one and make it work with that one, because if it doesn't work we are dead[,] we can't get left at the alter[,] so we have

Thus, despite the breadth of the definition of "Transaction," the 2002 Agreement applied to the information about the Company, not the Debtor Affiliates. In short, the subject matter of the 2002 Agreement and the subject matter of the Auction are distinct as a matter of law. Brill's reliance on the 2002 Agreement is misplaced.

## 2. *The 2000 Agreement*

Brill also cites the 2000 Agreement, emphasizing its unspecified duration and maintaining that its prohibition against Regent's use of Brill's proprietary information "to make contact with, solicit or enter into a business relationship with any other person or entity not a party to the Proposed Transaction" effectively prohibited Regent from attending and bidding at the August 2002 Auction. Id. at 1444. In contravention, Regent submits that, at the time the parties executed the 2000 Agreement, they could not have intended that the "Proposed Transaction" would include a bankruptcy auction because there was no evidence of any impending bankruptcy. Regent also notes that the proprietary information obtained in 2000 was stale and cumulative and thus of no efficacy in August 2002. See id. at 305-07 (referring to Alan Brill's deposition testimony that it sent the BAO the information it requested, that the BAO had discretion concerning what information to send to potential bidders, and that the information was "much the same" as information given pursuant to the confidentiality agreements already in place). Additionally, Regent emphasized the 2000 Agreement's allowance for use of confidential information obtained from another source. Id.

---

to work them all till we have one we accept . . . . Now we have Regent, [C]umulus, Saga probably, Triad, Boston Venture, PetraCom, Quad-C[,] each with its own problem and benefit.").

at 1443. In this vein, Regent asserts that the BAO was its third-party source. Thus, we address the agreement between the BAO and Regent.

### 3. The Debtors Agreement

Throughout the proceedings, Regent has steadfastly claimed that it did not use the confidential information it received from Brill in making its bid at the Auction. Instead, it purportedly used only the information provided by the BAO to all potential bidders in the form of the Debtors Agreement. Notably, this is the only agreement that specifically prohibits disclosure of confidential information concerning the Debtor Affiliates. Brill was not a party to this agreement; its signatories were Regent and the BAO. To the extent that the Debtors Agreement affects Brill as owner of the Debtor Affiliates, we note that it explicitly states, "This Agreement . . . supersedes all prior agreements, correspondence, arrangements and understandings relating to the subject matter hereof."[12] Id. at 1747.

Brill claims that an issue of material fact exists concerning what information Regent actually used in formulating its bid. It relies on PepsiCo, Inc. v. Redmond, 54 F.3d 1262, 1269 (7th Cir. 1995), for the proposition that Regent could not possibly have compartmentalized all the confidential information that it had received from Brill over years of negotiations to the point that it did not use any of that information to Brill's detriment when bidding at the Auction. In PepsiCo, Redmond, a high-level manager overseeing about twenty percent of PepsiCo's business, was courted away to Quaker, a competitor. PepsiCo

_____

[12] The subject matter hereof refers to the use of confidential information received from the BAO concerning the Debtor Affiliates.

21

sought an injunction to prevent Redmond from misappropriating trade secrets, divulging confidential information, and assuming any duties related to pricing, marketing, and distribution. PepsiCo, 54 F.3d at 1263. In affirming the trial court's decision to grant a six-month injunction, the Seventh Circuit emphasized that PepsiCo had presented substantial evidence that Redmond possessed extensive and intimate knowledge concerning PepsiCo's strategic goals for the coming year. Id. at 1269. The PepsiCo court reasoned that "unless Redmond possessed an uncanny ability to compartmentalize information, he would necessarily be making decisions about [his new employer's competitive product line] by relying on his knowledge of [PepsiCo's] trade secrets." Id. The court concluded that it was not Redmond's general skills and knowledge acquired while at PepsiCo that PepsiCo sought to silence but rather his knowledge of its particularized plans and processes unknown to others in the industry. Id.

Relying on PepsiCo, Brill asserts that the breadth of the information that it provided to Regent far exceeded that which Regent acquired from the BAO, i.e., not merely facts and figures, but also Alan Brill's analysis of those figures as well as information concerning operations, personnel, and market history. Regardless, Brill relies only on speculation, surmising that Regent must have used the prohibited information because it could not have compartmentalized it and reasoning that it is as impossible to regain confidential information as it is to "unring" a bell. See Promatek Industries, Ltd. v. Equitrac Corp., 300 F.3d 808, 813 (7th Cir. 2002) (affirming preliminary injunction where competitor misappropriated

22

Promatek's trademark in a metatag, likening competitor's misappropriation of goodwill to an attempt to unring a bell).

PepsiCo is distinguishable. There, Redmond was embarking on an ongoing relationship with Quaker, a major competitor, after having formulated PepsiCo's strategic plan for the next year, and the evidence showed that Redmond's impending duties included participating in strategic planning for Quaker. The PepsiCo court emphasized that, although Redmond was forever enjoined from disclosing PepsiCo's trade secrets and confidential information, the six-month injunction against him assuming his duties at Quaker would extend no further than necessary to protect PepsiCo with respect to Quaker's strategic plan. PepsiCo, 54 F.3d at 1272. Thus, PepsiCo had an employee noncompete aspect not present in this case.

Here, Brill has failed to designate any identifiable confidential information that Regent actually used at the Auction in contravention of either the 2000 Agreement or the 2002 Agreement. Instead, Brill merely speculates that Regent must have used the confidential information that it had provided. In his deposition, Alan Brill testified in part:

> Q: Okay. So that's what you believe you gave them that they didn't get through [the BAO] or wasn't available through [the BAO]. Okay. And it's your position that they used that in connection with their bid in 2002.
>
> A: They certainly would have if they had any brains.
>
> Q: If they had any brains.
>
> A: (Witness nods head.)

Q: Okay. Do you know whether they in fact used that information? You don't, right.

A: I can only say a reasonable person, basis.

* * * * *

Q: Okay. Can we go back, though, to the first question that I posed earlier? What documentary evidence do you have to support this contention that Regent used proprietary information in connection with the bid?

A: The proprietary information that had made them very interested in holding those stations to complement their company.

Q: Okay. So it is just a belief that you have. Is it anything more than a belief you have that this is important information that they had that they wouldn't necessarily have used if they were not imbeciles? Is there something more to your claim than your belief?

A: I'm very familiar with the industry and how people do deals in the media industry. And people don't do deals unless they have some reason to do them.

Q: Okay. And you are claiming that all the information that [the BAO]—

A: There were a lot of other—

Q: I'm sorry, let me finish. You are claiming that all the information that [the BAO] provided to any interested party, that that was not incentive enough for somebody to come and bid?

A: Not at that level necessarily.

Appellants' App. pp. 315-318. In short, Brill attempts to create a question of fact based on mere speculation, which it may not do. See Beatty, 896 N.E.2d at 20.

24

In his deposition, Alan Brill also stated his belief that by signing the 2000 Agreement Regent was absolutely banning itself from bidding at the unforeseen Auction, even though the BAO released much of the same information to Regent (and all other potential bidders) that had previously been covered by the 2000 Agreement. Alan Brill was questioned:

> Q: All right. Take a look at B on the 2000 agreement. Okay? It says, "Neither party shall have any obligation with respect to proprietary information or elements thereof disclosed, which," and if you look at No. 2, "are publicly known through no wrongful act of recipient; or 3, are rightfully received by Regent without restriction from a third party, not subject to any contractual or legal obligation to maintain the proprietary information as confidential." Do you see that?
>
> A: Um-huh.
>
> Q: Okay. Did you understand that if Regent got the information from another source, that they no longer had any obligations to you with respect to the proprietary information?
>
> A: I believe that this is as though they never received any proprietary information. I don't think you reverse the obligation they have got on the stuff that we've already gotten and later somebody else, two years later somebody gives it to you.
>
> Q: Okay. So your understanding that, is that this doesn't apply if they get it from you and get the same information two years later, you think they're still bound under this agreement?
>
> A: I do.

Appellants' App. pp. 313-14.

Alan Brill's assertions would render meaningless a key provision of the 2000 Agreement that excluded information learned from other sources. The designated evidence shows that, through the Debtors Agreement, the BAO provided the due diligence information that Regent needed to prepare its Auction bid. During the three-day Auction, Regent combined its bid with 21st Century's at the behest of the bankruptcy court and, even in so doing, it was not violating any exclusive dealing agreement because none existed. In fact, Regent designated documents indicating that Alan Brill was previously aware of Regent's intent to attend and bid at the Auction.[13] Brill was present at the Auction and bidding with its own partner Cumulus. By the end of the Auction, Regent's team and Brill's team were the only remaining bidders, and Brill certainly had equal or greater access to information (confidential or otherwise) concerning its own Debtor Affiliates. Brill's team could have outbid Regent's team but chose not to and did not object to Regent's presence and/or bids. As a matter of law, Brill has not identified any confidential information used by Regent that placed Brill at a competitive disadvantage.

**Conclusion**

In sum, the Agreements contained choice of law provisions, which encompassed both substantive and procedural law. As such, Virginia's statute of limitations barred Brill's claims as untimely. Therefore, we reverse the denial of Regent's motion to dismiss. We also conclude that, as a matter of law, the Agreements did not prohibit Regent from attending and bidding at the Auction, and Brill failed to identify any confidential information that Regent

---

[13] See, e.g., Appellants' App. p. 819 (Alan Brill's internal email verifying such knowledge, stating that he

26

actually used in formulating its bid that resulted in a competitive disadvantage to Brill. Thus, the trial court properly granted Regent's motion for summary judgment.

Reversed.

BAKER, J., and NAJAM, J., concur.

---

would like to suggest to Regent to "go sit on the sidelines.").