# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 16 2020, 10:02 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Deidre L. Monroe
Lake Superior Court, Juvenile Division
Public Defender's Office
Crown Point, Indiana

ATTORNEY FOR APPELLEES

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of E.M. (Minor Child)

and

K.M. (Father),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

June 16, 2020

Court of Appeals Case No.
19A-JT-2868

Appeal from the Lake Superior Court

The Honorable Thomas P. Stefaniak, Jr., Judge

Trial Court Cause No.
45D06-1906-JT-164

**Crone, Judge.**

## Case Summary

K.M. (Father) appeals the trial court's order terminating his parent-child relationship with his son, E.M. (Child). He challenges the trial court's conclusions that there is a reasonable probability that the conditions that led to Child's removal and continued placement outside the home will not be remedied and that termination of the parent-child relationship is in Child's best interests. We affirm.

## Facts and Procedural History

Child was born to N.M. (Mother) on May 17, 2013.[1] For the first year of Child's life, Mother was romantically involved with Father. After the two broke off their relationship, Father had very little contact with Child. In December 2016, Mother gave birth to Child's half sibling, who tested positive for marijuana at birth. As a result, the Indiana Department of Child Services (DCS) opened an informal adjustment, also citing Mother's failure to supervise Child. Child remained in Mother's home throughout the informal adjustment. During that time, Mother tested positive for marijuana and a controlled substance for which she did not have a prescription. Meanwhile, DCS received a report that Child, who showed signs of autism, had been wandering away from Mother's home. *See* Petitioner's Ex. A (DCS report stating Child is believed to be autistic and has been "diagnosed with Adjustment Disorder, with

---

[1] Mother voluntarily relinquished her parental rights and is not participating in this appeal.

mixed disturbance of emotions and conduct."). DCS also discovered that Mother had ceased taking Child to therapy. As a result, the informal adjustment was discharged as unsuccessful.

[3] Shortly thereafter, on February 6, 2018, DCS filed a petition seeking to have Child adjudicated a child in need of services (CHINS), based on Mother's drug use and unsuitable living conditions. The trial court entered a CHINS finding following a hearing. DCS's assessment division visited Mother's home and found Child in a filthy condition with bruises and a swollen arm. The intake officer's report listed Father's identity by his first name only, with last name unknown. Once identified, Father expressed an interest in establishing paternity and visiting Child. On February 9, 2018, Child was removed from Mother's care due to Mother's positive drug screen for methamphetamine and marijuana. He was initially placed in foster care, but two months later he was moved to relative care with his maternal aunt (Aunt), where he and his half sibling have remained since.

[4] Father's paternity ultimately was confirmed by a DNA test. DCS made referrals for services, which included working with Real Fathers Initiative to establish paternity and set up home-based services, participating in weekly supervised visitation and domestic violence services, completing clinical, substance abuse, and parenting assessments and following all recommendations, and submitting to random drug screens. He attended approximately ten weekly visits during the first six months of the CHINS case. After that time, Father pled guilty to level 6 felony counterfeiting and had his

probation revoked in connection with his 2017 convictions for level 6 felony domestic battery in the presence of a child and class A misdemeanor invasion of privacy. Pet. Exs. AA, CC, DD. He was incarcerated for approximately six months from the fall of 2018 through February 2019. He visited Child approximately ten times in the four months immediately following his February 2019 release.

[5] In June 2019, DCS changed the permanency plan from reunification to termination and adoption and filed a petition to terminate Father's parental rights. DCS held open all of Father's service referrals, including weekly supervised visitation. The trial court conducted a factfinding hearing on October 31, 2019. DCS Family Case Manager (FCM) Shannon Huffman testified that termination and adoption were in Child's best interests. She indicated that Father "has worked cash jobs, so they're untraceable," and had unsuccessfully applied for several jobs. Tr. Vol. 2 at 13. Regarding Father's housing, she testified that he lives at the home of his girlfriend (Girlfriend). FCM Huffman stated that she had been to the property a few times, and although Father and/or Girlfriend did not permit her to come inside, she could observe from the doorway that the residence was cluttered and bore a strong odor of mold and animals. She described the front yard as littered with tools, old cars, and laundry washers and dryers. With respect to services, she testified that Father completed the parenting and clinical assessments but did not complete the services and programs recommended as a result. She expressed particular concern that he did not complete the court-ordered psychological

evaluation, because he suffers from anxiety and Attention Deficit Disorder. *Id.* at 18. Father's drug screens had to be changed from home-based screens to clinic-based screens at Redwood Laboratory "due to issues of non-compliance and incident reports." *Id.* at 19. He completed only about half of them. His attendance at weekly supervised visits was "very, very, very sporadic …. Throughout the case, he's not been compliant with visitations." *Id.* at 20. Although the visits were offered up until the factfinding hearing, Father had not visited Child since June. *Id.* at 21. FCM Huffman summarized Father's progress as "[n]oncompliance," stating that "[t]here's very little bond" and "[a] lot of cancellations, because he had to tend to his girlfriend's children's needs or she was ill etc." *Id.*

[6] On November 6, 2019, the trial court issued an order with findings of fact and conclusions thereon, specifically finding that Father had not achieved the case-plan goals concerning suitable housing and employment and that he participated in his court-ordered services only sporadically, was persistently noncompliant with drug screens, failed to follow through with the recommendations of his substance abuse, parenting, and clinical assessments, failed to complete a psychological assessment or address his mental health issues, refused to allow DCS caseworkers to enter his home to provide services, and failed to participate in domestic violence counseling, weekly home-based therapy, or parenting education. Appealed Order at 2. With respect to visitation, the court found that although Father was offered weekly visits with Child up until the date of the factfinding hearing, he "continuously cancelled

the visits due to various reasons," had not visited Child since June 2019, and had not established a bond with Child. *Id*. As a result, the trial court terminated Father's parental relationship with Child.

Father now appeals. Additional facts will be provided as necessary.

## Discussion and Decision[2]

Father contends that the trial court erred in terminating his parental relationship with Child. When reviewing a trial court's findings of fact and conclusions thereon in a case involving the termination of parental rights, we first determine whether the evidence supports the findings and then whether the findings support the judgment. *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014). We will set aside the trial court's judgment only if it is clearly erroneous. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). "A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *In re A.G.*, 45 N.E.3d 471, 476

---

[2] The summary of argument and argument sections of Father's brief include invective against the trial court and DCS. *See*, *e.g.*, Appellant's Br. at 7, 14 (characterizing certain trial court findings as "blatant disregard for the termination laws," claiming that the "direct assault" and "continued destruction of the family structure should not be tolerated by this Court," and alleging that "DCS's objective should not be to cause measurable pain and suffering on a young child."). We remind counsel that the purpose of an appellate brief is to present us with concise argument supported by statutory law, case law, and the record. Ind. Appellate Rule 46(A)(8). "Invectives are not argument, and have no place in legal discussion." *Brill v. Regent Commc'ns, Inc.*, 12 N.E.3d 299, 301 n.3 (Ind. Ct. App.2014) (citation omitted), *trans. denied*. Additionally, Father's statement of the case and statement of facts sections improperly contain argument. *See*, *e.g.*, Appellant's Br. at 5-6 ("Sadly, it appears that the DCS never intended to reunite E.M. with his FATHER," and "[Father] worked tirelessly to complete his case plan."). Indiana Appellate Rule 46(A)(5) and -(6), limit the information to be included in these sections, and they should not contain argument. *See*, *e.g.*, *K.S. v. D.S.*, 64 N.E.3d 1209, 1216 (Ind. Ct. App. 2016) ("[T]he statement of facts should be devoid of argument."). Father also has included in his appendix a reproduction of portions of the transcript in violation of Indiana Appellate Rule 50(F).

(Ind. Ct. App. 2015), *trans. denied* (2016). Unchallenged findings stand as proven, and we simply determine whether the unchallenged findings are sufficient to support the judgment. *T.B. v. Ind. Dep't of Child Servs.*, 971 N.E.2d 104, 110 (Ind. Ct. App. 2012), *trans. denied*; *see also McMaster v. McMaster*, 681 N.E.2d 744, 747 (Ind. Ct. App. 1997) (unchallenged findings are accepted as true). In conducting our review, we neither reweigh evidence nor judge witness credibility. *E.M.*, 4 N.E.3d at 642. Rather, we consider only the evidence and inferences most favorable to the judgment. *Id.* "[I]t is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by the appellant before there is a basis for reversal." *Best v. Best*, 941 N.E.2d 499, 503 (Ind. 2011) (citations omitted).

[9] "Parents have a fundamental right to raise their children – but this right is not absolute. When parents are unwilling to meet their parental responsibilities, their parental rights may be terminated." *Matter of Ma.H.*, 134 N.E.3d 41, 45-46 (Ind. 2019) (citation omitted), *cert denied* (2020). To obtain a termination of a parent-child relationship, DCS is required to establish in pertinent part:

> (A) that one (1) of the following is true:
>
> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>
> ….
>
> (B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).

[10] In recognition of the seriousness with which we address parental termination cases, Indiana has adopted a clear and convincing evidence standard. Ind. Code § 31-37-14-2; *Castro v. State Office of Family & Children,* 842 N.E.2d 367, 377 (Ind. Ct. App. 2006), *trans. denied.* "Clear and convincing evidence need not reveal that the continued custody of the parents is wholly inadequate for the child's very survival. Rather, it is sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody." *In re K.T.K.*, 989 N.E.2d 1225, 1230 (Ind. 2013) (citation omitted). "[I]f the court finds that the allegations in a [termination] petition … are true, the court *shall* terminate the parent-child relationship." Ind. Code § 31-35-2-8(a) (emphasis added).

## Section 1 – Father has failed to establish that the trial court clearly erred in concluding that there is a reasonable probability that the conditions that resulted in Child's removal and continued placement outside the home will not be remedied.

Father asserts that the trial court clearly erred in concluding that a reasonable probability exists that the conditions that led to Child's removal and continued placement outside the home will not be remedied.[3]  When assessing whether there is a reasonable probability that conditions that led to a child's removal will not be remedied, we must consider not only the initial basis for the child's removal but also the bases for continued placement outside the home.  *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*.  Moreover, "the trial court should judge a parent's fitness to care for his children at the time of the termination hearing, taking into consideration evidence of changed conditions."  *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*.  "Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior."  *E.M.*, 4 N.E.3d at 643.  "Due to the permanent effect of termination, the trial court also must evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the

---

[3]  Father briefly raises, but does not develop, an argument concerning the trial court's conclusion that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to Child's well-being.  We note that Indiana Code Section 31-35-2-4(b)(2)(B) requires DCS to prove only one of the three circumstances listed.  Because we find no error concerning the reasonable probability that the conditions prompting Child's removal will not be remedied, we need not address the threat to Child's well-being.

child." *J.T.*, 742 N.E.2d at 512. In making its case, "DCS need not rule out all possibilities of change; rather, [it] need establish only that there is a reasonable probability that the parent's behavior will not change." *In re Kay.L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). The court may properly consider evidence of a parent's substance abuse, criminal history, lack of employment or adequate housing, history of neglect, and failure to provide support. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003).

[12] The conditions that prompted Child's initial removal pertained to Mother's shortcomings, not Father's. At that time, DCS did not know Father's identity. However, after his identity and paternity were established, Father's actions and inactions throughout the remainder of the CHINS and termination proceedings contributed to Child's continued placement outside the home. The trial court summarized these actions and inactions as follows:[4]

> The services in the case plan always remained available for Father to participate in, but Father failed to make himself available for the services. Father has shown no interest in participating in the services in an effort to gain custody of his child. Father continues with his lack of stability and lack of employment. Father has made no progress in the case plan for reunification…. Father refuses drug treatment, therapies, and rarely participates in the visitations.

---

[4] To the extent that the trial court uses different terms or initials to identify Father and Child, we refer to them as designated throughout this decision.

Appealed Order at 2.

[13] Father maintains that by the time of the factfinding hearing, he was in substantial compliance with his case plan. He specifically challenges the trial court's finding that he continued to lack stable employment and housing. He told FCM Huffman that he was employed on a cash basis; however, he did not provide documentation to verify his cash-basis earnings. He also maintains that his living arrangements with Girlfriend were suitable; however, the record shows that he refused to allow DCS to enter the home to provide services and that he and Girlfriend had a history of breakups and domestic violence and had a troubled child in the home whose abuse of a sibling had precipitated visits from police. Tr. Vol. 2 at 74. Mother testified that one time she received a call from one of Girlfriend's children saying that Girlfriend had a knife and had locked Child and Father in a closet. *Id*. at 58. She described Girlfriend's house as having holes in the floor and animal feces everywhere. *Id*. at 61; *see also* Petitioner's Exs. W, X, Y (photos depicting clutter and squalor in Girlfriend's front and side yard). The frequent breakups between Father and Girlfriend ordinarily resulted in Father being kicked out of Girlfriend's house and in need of shelter. Yet, he continued to return to the relationship and the house. In short, Father's tumultuous relationship with Girlfriend made his living arrangements unstable and unsafe.

[14] This, in turn, negatively affected Father's participation in his court-ordered services. His home-based drug screening service provider had to stop going to his house due to safety issues with the dog and other physical incidents. Tr. Vol.

2 at 33. Because Father's residence shifted between two counties, DCS had to make several switches to ensure that Father would have continuous access to service providers throughout the pendency of the proceedings. DCS went the extra mile in facilitating these changes by providing transportation to services and holding his services open up until the date of the factfinding. Even then, Father did not complete the services recommended following the three assessments that he underwent and would often refuse to submit to drug screens. *See id*. at 73 (Father's testimony regarding drug screens: "At some point out of principal [sic], I said, I'm not doing this," even though he was told that refusal is "a fail"); *see also* Petitioner's Ex. Z (list of Father's drug test no-shows from Redwood).

[15] Father also challenges the trial court's finding that he did not participate in services to address his mental health issues. He claims that he *did* address his mental health issues through Edgewater, a provider connected with his probation. FCM Huffman addressed this in her testimony, indicating that Father had informed her about Edgewater and signed a records release for 2017 and 2018. However, "when his probation case was dismissed, he said he was done" at Edgewater. Tr. Vol. 2 at 35. He did not present any documentation to show that he had participated in these services in 2019. *Id*. at 36.

[16] Father also asserts that his incarceration hindered his ability to participate in services and should not be held against him. He analogizes his circumstances to those in *K.E. v. Indiana Department of Child Services*, 39 N.E.3d 641, 643 (Ind. 2015). There, the father was incarcerated and upon his release began

participating in his court-ordered services. The trial court nevertheless terminated his parental rights, emphasizing the effects of his incarceration. *Id.* In reversing the termination order, our supreme court reiterated its earlier holding that incarceration is an insufficient basis upon which to terminate a parent's rights. *Id.* (citing *In re G.Y.*, 904 N.E.2d 1257, 1264-66 (Ind. 2009)). Here, the trial court mentioned Father's criminal record in its termination order and articulated its concern about the nature of his offenses, particularly his conviction for domestic violence in the presence of a child. However, the court in no way emphasized Father's incarceration as a basis for terminating his parental rights. If anything, the record shows that DCS gave Father accommodations for his lost time in jail by holding open his service referrals up until the October 2019 factfinding hearing. In so doing, DCS afforded Father approximately eight months after his release to complete services that otherwise might not have been available to him. Father's arguments with respect to housing, employment, and services are merely requests to reweigh evidence and reassess credibility, which we may not do. *E.M.*, 4 N.E.3d at 642.

[17] With respect to visitation, DCS's extension of services resulted in many additional opportunities for Father to visit Child and demonstrate that he was earnest in his desire to establish a parent-child bond. He did not do so. *See* Tr. Vol. 2 at 47 (home-based caseworker Deanna Howard's testimony that she "texted and texted" Father to facilitate visits but never heard back from him). The trial court summarized Father's visitation and bonding efforts as follows:

Father was offered weekly visitations with Child, but Father failed to visit. Father has not visited Child since June 2019. Father has not established a bond with Child due to Father's lack of participation in the visits. Father continuously cancelled the visits due to various reasons. Father has had very minimal contact with Child due to the lack of participation in the visitations by Father.

*Father was offered transportation services through the home[-]based services. Father would utilize the service to attend doctor[] appointments and lawyer appointments, but not to attend the visitations with his Child.*

Appealed Order at 2 (emphasis added).

[18]     We find it especially troubling that despite having been provided transportation to facilitate his weekly court-ordered visits with Child, Father did not visit Child at all in the four months immediately preceding the factfinding hearing. A parent's failure to exercise his visitation rights demonstrates a lack of commitment to the parent-child relationship and the plan to preserve it. *See Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007) (failure to exercise right to visit one's children demonstrates lack of commitment to complete actions necessary to preserve parent-child relationship), *trans. denied*. Father has failed to meet his burden of establishing clear error in the trial court's conclusion that there is a reasonable probability that the conditions that led to Child's removal and continued placement outside the home will not be remedied.

## Section 2 – Father has failed to establish that the trial court clearly erred in concluding that termination is in Child's best interests.

[19]     Father also challenges the trial court's conclusion that termination of the parent-child relationship is in Child's best interests. To determine what is in the best interests of a child, we must look at the totality of the circumstances. *In re A.W.*, 62 N.E.3d 1267, 1275 (Ind. Ct. App. 2016). The trial court "need not wait until a child is irreversibly harmed before terminating the parent-child relationship." *S.E. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 37, 47 (Ind. Ct. App. 2014), *trans. denied*. Although not dispositive, permanency and stability are key considerations in determining the child's best interests. *G.Y.*, 904 N.E.2d at 1265. "A parent's historical inability to provide a suitable environment along with the parent's current inability to do the same supports a finding that termination of parental rights is in the best interests of the children." *In re A.P.*, 981 N.E.2d 75, 82 (Ind. Ct. App. 2012) (quoting *Lang*, 861 N.E.2d at 373). Likewise, "the testimony of the service providers may support a finding that termination is in the child's best interests." *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010), *trans. dismissed*.

[20]     Here, FCM Huffman testified that termination and adoption are in Child's best interests. When she expressed her concern about Child being placed with Father, she addressed Father's living conditions, which included not only the physical condition of the property, e.g., the clutter, odors, and close proximity to a highway, but also other environmental circumstances such as the domestic

violence, alcohol use, and substance abuse occurring there. She contrasted the environment at Aunt's house, in which Child is thriving, playing sports, loving school, and bonded with Aunt, Aunt's children, and his half sibling. Tr. Vol. 2 at 26.[5] She observed Child's apparent lack of disappointment when Father cancelled their visits and his eagerness to return to Aunt's home after the visits that did take place. *Id.* at 24. She recounted a particular visit when the police were called due to an altercation between Father and Girlfriend, and Child matter-of-factly stated, "Well, this is cancelled." *Id.* She emphasized Child's need for "permanency officially" and summed up her observations by stating, "He likes how things are …. He's ready to be adopted by his Aunt." *Id.* at 26.

[21] The totality of the circumstances supports the trial court's conclusion that termination of the parent-child relationship is in Child's best interests. Father has failed to meet his burden of establishing clear error in the trial court's judgment terminating his parental rights. Accordingly, we affirm.

[22] Affirmed.

Bailey, J., and Altice, J., concur.

---

[5] Father submits that the trial court clearly erred when it "failed to address the pain and suffering that the child will indeed experience when they realize that she [sic] will not have any further contact with their father." Appellant's Br. at 14. The record is devoid of any evidence to support this argument. In fact, FCM Huffman's testimony underscores the absence of a meaningful relationship between Father and Child. *See* Tr. Vol. 2 at 24 ("Child has really no bond with Father. He doesn't ask about Father. He's not disappointed when visits are cancelled.").